986 F.2d 1424
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
William FLOOD, Joseph Flood, and Robert Flood, doing
business as Northwest Disposal, Plaintiffs-Appellants,
v.
WASTE MANAGEMENT, INCORPORATED, a Delaware corporation,
Waste Management of Illinois, Incorporated, a
corporation, John Horak, et al.,
Defendants-Appellees.
 No. 91-3674.
 United States Court of Appeals, Seventh Circuit.
 Argued June 9, 1992.
Decided Feb. 25, 1993.
 
 Before FLAUM and RIPPLE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 
 ORDER
 
 1
 This is an appeal from a district court order granting summary judgment for the defendants on claims alleging a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a) & (c) (1988), and tortious interference with prospective economic advantage. Specifically, Northwest Disposal (Northwest) claims that it lost a city contract for which it was the low bidder because the defendant, Waste Management, illegally bribed city officials. For the reasons that follow, we affirm.
 
 
 2
 * BACKGROUND
 
 
 3
 In 1981, the Village of Fox Lake, Illinois solicited bids for a four-year contract to collect garbage within the Village limits. By local ordinance the Village was required to award the contract to the "lowest responsible bidder." Relevant factors to determine which bidder met this description included not only the price which the bidder quoted, but also the bidder's financial stability, reputation, and the quality of its services. A total of four bids were submitted for evaluation by the Village Health and Sanitation Committee (Committee). The Committee was to recommend a bidder to the Village Board of Trustees (Board), which made the final decision in awarding the contract. The Committee consisted of Richard Gerretsen, Scott Shalek, and Jean Berdnick. The Board consisted of these three Committee members and George Kratsch, Margaret Paull, Richard Krueger. Shalek chaired the Committee; he also led the analysis of competing bids before the Board voted on the award of the contract. In the event of a deadlock, the Village Mayor was empowered to cast the deciding vote.
 
 
 4
 It is undisputed that the appellant, Northwest, submitted the lowest bid for the Fox Lake contract. However, the contract ultimately was awarded to Waste Management ("HOD"),[1] the second lowest bidder.[2] It is also undisputed that Northwest did not submit any supplemental information with its bid to establish its financial solvency or prior service record in the industry. HOD had held the Fox Lake contract since 1960. Northwest was formed by William, Joseph, Robert, and Emmet Flood in 1980, only eighteen months before the Fox Lake garbage hauling contract came up for renewal. However, the Flood brothers had had prior individual experience in the garbage disposal industry.
 
 
 5
 The parties dispute both whether Northwest was asked for additional information regarding its reliability and whether it attempted to make such submissions on its own initiative. Northwest claims that it was never asked to submit any supplemental information, but, on its own initiative, attempted to make such a submission on two occasions. Emmet Flood testified that he attempted to discuss Northwest with the Village mayor, Richard Hamm, but that Mayor Hamm had no interest in hearing about Northwest. Additionally, Joseph Flood testified that shortly after Northwest submitted its bid, he went to city hall to attempt to check on the status of the prospective contract. He further testified that the clerk's office was "aloof, [and] would not talk to [him]. It was like [he] was poisoned." Joseph Flood Dep. at 35. In contrast, Shalek testified that he specifically and repeatedly requested additional information from Northwest, which failed to respond. Shalek stated that he believed that the failure to submit requested information was an indication of Northwest's irresponsibility and lack of qualification to receive the contract. Shalek Dep. at 14-18, 48. Emmet Flood gave the following deposition testimony about Shalek's comments:
 
 
 6
 [I]t is a lie.... he never requested jack from me. Let's get it on the record ... my answer was Mr. Shalek never requested information from me of the soundness of my business or my operating experience ... he never asked me for a financial statement of proof with my experience.
 
 
 7
 Emmet Flood Dep. at 129.
 
 
 8
 Ultimately, the committee recommended that HOD receive the contract "because of the absence of information about Northwest, and HOD's prior good record." Mem.Op. at 4 (April 23, 1991). Berdnick, the third Committee member who served with Gerretsen and Shalek, testified that she relied upon Shalek to obtain information about Northwest and that it was her understanding that Shalek had requested information from Northwest, which failed to respond. Berdnick Dep. at 5-7. The Board voted unanimously to adopt the Committee recommendation and awarded the contract to HOD. The three "non-Committee" Board members all submitted deposition testimony that they relied entirely upon the Committee's judgment, and had assumed that the Committee had adequately examined the responsibility of each bidder. Kratsch Dep. at 13; Krueger Dep. at 7; Paull Dep. at 7.
 
 
 9
 In 1981, unbeknownst to Northwest, HOD, through defendant John Horak, paid $5,000 bribes to both Richard Gerretsen and former Mayor Richard Hamm.[3] Consequently, Horak was convicted of mail fraud and criminal RICO activity,[4] and Hamm and Gerretsen both pled guilty to extortion, racketeering, and bribery.[5] Additionally, the Village of Fox Lake filed a civil RICO action against HOD, Horak, Groenboom, and DeBoer, alleging that it was injured in its business as a municipal corporation because it paid HOD $65,000 more than the price quoted by the lowest bidder on the Fox Lake garbage contract.[6]
 
 
 10
 In 1987, Northwest brought the present five-count civil suit against HOD, Horak, Groenboom, and DeBoer. It alleged that "but for defendants' racketeering activity; fraudulent conduct and bribery scheme, plaintiffs would have received the Fox Lake garbage removal contract." Amended Complaint at p 15. All of the Board members have submitted affidavits stating that they rejected Northwest's bid solely because of the Committee's determination regarding Northwest's responsibility. Consequently, the defendants sought summary judgment on the ground that Northwest could not show that its alleged injury, i.e., loss of the Fox Lake contract, was caused by HOD's bribery scheme.
 
 II
 PROCEDURAL HISTORY
 
 11
 Counts I and V of Northwest's original complaint arose under The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a) & (c) (1988). Counts II, III, and IV asserted claims for fraud, tortious interference with prospective economic advantage, and violation of the Illinois Consumer Fraud and Deceptive Practices Act. The district court dismissed Counts II, IV, and V; which Northwest does not appeal.[7] Accordingly, we shall not discuss them here. Counts I and III, the RICO and tortious interference with prospective economic advantage claims,[8] remain on appeal.
 
 
 12
 The district court found that nothing existed in the record that would tend to show that the bribery of Mayor Hamm and other officials, including Richard Gerretsen, was causally related to Northwest's injury. Specifically, the district court stated:
 
 
 13
 It is not in dispute that, while the Floods were the lowest bidders, their operation could not have won the contract because they were unknown in the area and they had put no information before the Committee to show that they were the "lowest responsible bidder."
 
 
 14
 Mem.Op. at 3 (Oct. 21, 1991) (emphasis in the original). The district court also emphasized that only one of six voting Board members was bribed and all six gave testimony that their rejection of the Northwest bid was not connected to HOD's bribery scheme. Accordingly, the district court entered summary judgment for HOD, on the ground that there was no genuine material issue of fact.
 
 III
 ANALYSIS
 
 15
 On appeal, Northwest challenges the district court's disposition on three alternative grounds. First, Northwest argues that HOD should be legally estopped from denying that its bribery scheme was causally related to obtaining the garbage hauling contract, which was admittedly the purpose of the bribes. Second, Northwest submits that, even if the defendants are not estopped from denying causation, the fact that they paid bribes to receive the contract and subsequently received it, even though they were not the low bidder, should give rise to a special presumption that their conduct caused the result, and thus bar summary judgment. Finally, Northwest argues that summary judgment was inappropriate because there are disputed issues of material fact which could lead a reasonable fact finder to conclude that HOD's bribery scheme caused the rejection of Northwest's contract bid. In contrast, HOD maintains that the district court correctly determined that Northwest's case did not rise above the level of mere speculation and thus could not survive the summary judgment motion.[9]
 
 
 16
 A. Special Evidentiary Presumptions to establish Causation in Civil RICO Cases
 
 
 17
 In order to recover for the civil RICO violation alleged, Northwest must prove that its injury (not being awarded the Village contract) was caused "by reason of" HOD's racketeering activity. 18 U.S.C. § 1964(c); Reynolds v. East Dyer Dev. Co., 882 F.2d 1249, 1254 (7th Cir.1989) (finding that plaintiff could not show causation was sufficient grounds for summary judgment in civil RICO action).[10]
 
 
 18
 Northwest argues that showing direct causation in a bribery scheme often creates insurmountable problems of proof because the defendants can always claim that the ultimate result would have been the same even absent misconduct. Consequently, submits Northwest, proof of a bribery scheme together with proof that the scheme's ultimate objective was achieved should give rise to an irrebuttable presumption that the bribery and the intended result were causally related; the defendant legally should be estopped from denying causation. Northwest next argues, in the alternative, that the existence of a bribery scheme which appears to have achieved its goal should at least create a presumption of causation which cannot be defeated in summary judgment. The district court acknowledged the difficulty of proof in complex racketeering cases; however, it concluded that such difficulty cannot justify a court's assuming the existence of an essential element of Northwest's RICO claim. Mem.Op. at 8 (Oct. 21, 1991).
 
 
 19
 We believe that neither of these arguments is valid. We note that the Supreme Court has recently confirmed that proximate cause is an essential element of RICO civil liability. Holmes v. Securities Investor Protection Corp., 112 S.Ct. 1311 (1992). Indeed, this court has recently pointed out that the "civil RICO liability is not unlimited, ... proximate cause is a means of limiting the potentially limitless liability flowing factually from a person's acts." Schiffels v. Kemper Fin. Servs., Inc., 978 F.2d 344, 350 (7th Cir.1992). Accordingly, we cannot accept that a civil RICO plaintiff need not affirmatively establish causation.
 
 B. Summary Judgment
 
 20
 We review a district court's grant of summary judgment de novo. The evidence, when all factual inferences are taken in the light most favorable to Northwest, the nonmovant, must be such that there is no genuine issue of material fact and HOD is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Anderson v. Stauffer Chem. Co., 965 F.2d 397, 400 (7th Cir.1992). At the summary judgment stage, the court may not weigh evidence or make credibility determinations. The court's sole inquiry is whether there is a genuine issue for trial, i.e., "whether a proper jury question [is] presented." Liberty Lobby, Inc., 477 U.S. at 248. On the other hand, in reviewing evidence opposing a motion for summary judgment, the court is not obliged to entertain a "metaphysical doubt." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). See also Donohoe v. Consolidated Operating & Prod. Corp., No. 91-1970, slip op. at 11 (7th Cir. Dec. 28, 1992) (on summary judgment motion, only "reasonable inferences [need be drawn] in favor the non-movant, not every possible inference") (emphasis in original).
 
 
 21
 To avoid summary judgment, Northwest must establish a reasonable inference that, absent the bribes which HOD passed to Gerretsen and Hamm, the Board would have awarded the garbage hauling contract to Northwest. See Reynolds v. East Dyer Dev. Co., 882 F.2d 1249, 1254 (7th Cir.1989) (finding that plaintiff could not show causation was sufficient grounds for summary judgment in civil RICO action). Thus, the linchpin of this appeal is whether the bribes HOD passed to Gerretsen and Hamm were the proximate cause of the rejection of Northwest as the successful bidder.
 
 
 22
 The district court based its decision to grant summary judgment largely upon the "unopposed" affidavits submitted by each of the five independent Board members, which stated that: (1) they were not influenced by Gerretsen or Hamm; and (2) they did not vote to award the contract to Northwest, admittedly the lowest bidder, because they were unable to assess whether Northwest was a "responsible" bidder. Mem.Op. at 6 (Oct 21, 1991). Additionally, both Hamm and Gerretsen testified that they made no attempt to influence any of the Board members' views with respect to the award of the contract.[11]
 
 
 23
 Northwest relies primarily upon the testimony of Emmet and Joseph Flood. Specifically, Northwest alleges that either (1) Shalek did not request information from the Floods, and a reasonable inference can be drawn that his testimony to the contrary was a pretext to cover the fact that the Board would have chosen Northwest as the lowest responsible bidder had HOD not bribed city officials; or (2) Northwest would have been able to submit supplemental information establishing them as a responsible bidder had HOD not bribed city officials.[12]
 
 
 24
 Northwest argues that Emmet Flood's testimony that Shalek never asked him for additional information to supplement Northwest's bid creates a material dispute, foreclosing summary judgment. Specifically, Shalek testified that he repeatedly asked one of the Flood brothers for additional information, which he never received. Shalek also testified that he was unable to remember with which Flood he spoke. Significantly, only Emmet Flood testified that Shalek never requested additional information. Moreover, he also stated: "I can't answer what [Shalek] asked my two brothers or my cousin." Emmet Flood Dep. at 130. In response, HOD argues that, because Shalek could have asked three other Floods for information, there was no conflict in the testimony. We agree. Northwest could have submitted testimony from the remaining Floods to place Shalek's testimony in dispute. It failed to do so, and we shall not now speculate as to what their testimony might have been.
 
 
 25
 Alternatively, Northwest alleges that the testimony of Emmet and Joseph Flood, that they were not openly received by the mayor and a clerk at city hall, tends to disprove Shalek's testimony that the Village requested information from Northwest. We cannot accept this contention. It is undisputed that Mayor Hamm was bribed by HOD. However, the extent of Emmet Flood's testimony was that he went to the mayor's office, unannounced, to ask him to lunch and "get a feeling for him." Emmet Flood never testified that he intended to discuss Northwest's contract bid or Northwest's reliability generally. In fact, he testified that the "meeting" was before the bidding process was opened. Moreover, even though Emmet Flood admittedly had no appointment, Mayor Hamm did speak to him. Emmet Flood Dep. at 94-97. We are unwilling to draw any conclusion from the fact that Mayor Hamm declined to allow Emmet Flood to buy him lunch.
 
 
 26
 The testimony of Joseph Flood is even more attenuated. Specifically, he testified that he went to the Fox Lake city hall to check on the status of the contract bidding and was rebuffed by a clerk. Significantly, Joseph Flood was unable to recall exactly who he wanted to speak with, what he intended to say, or the substance of the conversation he had. Joseph Flood Dep. at 12-15, 34-35. The point of his testimony appears to be that Village officials had already predetermined that Northwest would not get the contract and thus had no desire to speak with the Floods. However, he admittedly had no appointment and does not contend that anyone in the office refused to accept any written information about Northwest. In fact, in reference to the visit he stated: "[S]omebody was out and they were too busy, and [she said] to come back in a week." Id. at 13. He was unable to recall whether he attempted to go back as instructed. HOD does not dispute any of this testimony. Instead, it merely responds that it is not material because it does not tend to connect HOD's bribery scheme to anything. We agree. Even if we accept as true Joseph Flood's allegation that the clerks he encountered in city hall were subtly "freezing out" Northwest, the Floods have failed to present any evidence that would connect this response with the money paid to Hamm or Gerretsen.
 
 
 27
 Northwest has submitted in its briefings and at oral argument that at the very least HOD "bought" the silence of Gerretsen and Hamm. It suggests that HOD had made certain that neither official would emphasize that HOD was not the lowest bidder or that a more thorough investigation into the responsibility of the lowest bidder would be prudent. We believe this argument is too speculative. As the district court noted, Gerretsen "represented only one vote, which could be handily overridden." Mem.Op. at 6 (Oct. 21, 1991). Northwest contends that this consideration should not have been dispositive where the evidence hinges upon statements of one individual, Shalek, which were disputed by the opposing party in sworn deposition testimony. However, as detailed above, none of the Floods' testimony directly conflicted Shalek's testimony. Moreover, even if we were to assume that Shalek never solicited information directly from the Floods, Northwest has not established a causal link between HOD's bribery scheme and Shalek's alleged behavior. Northwest concedes in their brief that "there is no evidence establishing that [Shalek] had any participation in the bribery scheme."[13]
 
 
 28
 Taken in the light most favorable to Northwest, the record reveals the following. There were a total of six Board members. Only three of the Board members served on the recommending Committee; one (Gerretsen) received bribe money from HOD; the second (Shalek) claimed to have requested information from the Floods, and the third (Berdnick) relied upon Shalek's alleged unanswered request to the Floods. The three remaining Board members all testified that they relied exclusively upon the Committee, which for practical purposes was Gerretsen and Shalek. Northwest concedes that there is no evidence linking Shalek to the bribery scheme and makes no allegation that Shalek was involved. In order to avoid summary judgment, Northwest may not rely solely on mere allegations in their pleadings, but must set forth specific facts to show a genuine issue for trial. Local 1545 v. Inland Steel Coal Co., 876 F.2d 1288, 1293 (7th Cir.1989). After careful review of the record, we cannot conclude that the district court erred in granting summary judgment for HOD.
 
 Conclusion
 
 29
 For the foregoing reasons the judgment of the district court is affirmed.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 HOD Disposal [HOD] is the division of Waste Management directly involved in the present dispute. John Horak, general manager of HOD, John DeBoer, president of Waste Management, and John Groenboom, vice-president of Waste Management, were also named as defendants in the present dispute
 
 
 [2]
 Specifically, HOD bid $13,250 per month and Northwest bid $12,092 per month
 
 
 [3]
 In the summer of 1983, Horak paid an additional $2,000 bribe to Hamm in conjunction with the garbage collection services provided by HOD. Accordingly, the 4 year statute of limitations on RICO actions did not begin to run until mid-1983
 
 
 [4]
 United States v. Horak, 85 CR 373, aff'd in part and vacated and remanded in part, 833 F.2d 1235 (7th Cir.1987)
 
 
 [5]
 United States v. Hamm, 85 CR 284
 
 
 [6]
 Village of Fox Lake v. Waste Management of Illinois, Inc., 86 C 4888. The Fox Lake suit against HOD was eventually settled
 
 
 [7]
 Initially, Northwest also contested the district court's dismissal of Count IV, which alleged unfair methods of competition in violation of the Illinois Consumer Fraud Act. However, in their reply brief and at oral argument Northwest conceded that the claim was barred by their failure to plead the essential element that consumers or the general public were harmed by HOD's alleged conduct. Consequently, Count IV is no longer on appeal. Although the state legislature amended the Act in 1990 expressly noting that consumer injury is not a prerequisite, this court has previously determined that the amendment does not operate retroactively. A. Kush & Assocs. v. American States Ins., 927 F.2d 929, 939 (7th Cir.1991)
 
 
 [8]
 The district court concluded that both the federal RICO claim and the state law tort claim failed because Northwest could not establish the necessary causation element. Accordingly, the district court did not discuss the state law claim separately. Because causation is now the only issue on appeal, we shall also discuss only the RICO claim. However, we note that our analysis is the same for the state law claim of tortious interference with prospective economic advantage
 
 
 [9]
 Defendant Horak submitted supplemental briefing to argue that Count I of Northwest's complaint should have been dismissed because Northwest lacks standing. Specifically, he argued that any injury suffered by Northwest was collateral to an injury to the real party in interest, the Village of Fox Lake. See Carter v. Berger, 777 F.2d 1173 (7th Cir.1985). Horak's reliance upon Carter is misplaced. Carter arose out of a scheme to bribe city officials in Cook County in order to reduce the tax assessments of the defendants' clients. The plaintiffs were taxpayers in the city who claimed that they were injured because their taxes had been increased to make up the monetary deficit created by the lower assessments
 Id. at 1174. In contrast, the present case involves a very small arena; only 4 bids were submitted for the Fox Lake contract and a Village ordinance provided specific (although subjective) criteria upon which the award must be made. The criteria included price and Northwest was undisputedly the lowest bidder. This is not the type of indirect injury which concerned us in Carter.
 
 
 [10]
 Section 1964(c) provides:
 Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.
 18 U.S.C. § 1964(c) (emphasis added).
 
 
 [11]
 We cannot accept appellants' contention that "the testimony of bribe takers is inherently unworthy of belief." There is no genuine issue of material fact if the most that the plaintiff can hope for is to discredit the movant at trial. Parker v. Federal Nat'l Mortgage Assoc., 741 F.2d 975, 980 (7th Cir.1984)
 
 
 [12]
 Northwest also notes that nothing in the bidding procedure indicated that additional information was necessary for their bid to be competitive. While this is not in dispute, Northwest did have access to the published ordinance indicating that the Board was required to choose the lowest "responsible" bidder. Although the Flood brothers had individually been involved in the garbage disposal business for some time, Northwest was admittedly a new partnership with no prior experience in Fox Lake. We cannot accept that they were not on at least minimal notice that they would need to demonstrate that they were a responsible choice
 
 
 [13]
 Northwest also suggests that the fact that the Village of Fox Lake sued HOD for damages equal to the difference between HOD's contract price and Northwest's bid is evidence that the Board was improperly motivated in their bid selection. Further, submits Northwest, a reasonable inference may be drawn that HOD, who had held the Fox Lake contract for 20 years, would not have risked criminal and civil liability had they not believed both that the contract was in jeopardy and that a bribe would effect the likelihood of their renewal. This may be true. However, the intention of the participants in the bribery scheme is not at issue in this appeal. John Horak, general manager of HOD, Gerretsen, and Hamm have already been indicted and convicted for their criminal offenses. The sole issue before us now is whether Northwest would have been awarded the contract absent HOD's misconduct. Thus, we do not find these contentions material