Doris SANDERS, Plaintiff,

v.

The WOMEN'S TREATMENT CENTER, Defendant.

No. 96 C 2593.

United States District Court, N.D. Illinois, Eastern Division.

June 30, 1998.

Steven J. Kadison, Kamenear, Kadison & Anderson, Chicago, IL, for Plaintiff.

Doris Sanders, Chicago, IL, pro se.

Julie Badel, Judith A. Kelley, McDermott, Will & Emery, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Doris Sanders filed suit in this Court alleging that her former employer, The Women's Treatment Center (the "Center"), discriminated against her on the basis of religion. Sanders claims that once she revealed her status as a Seventh–Day Adventist, the Center began to barrage her with baseless criticism and disciplinary actions, ultimately discharging her. Her allegations comprise two discrete causes of action (although Sanders does not use separate counts to delineate them). First, Sanders claims that she was terminated because she is a Seventh–Day Adventist in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Second, Sanders claims that the Center subjected her to a hostile environment on the basis of her religion in violation of Title VII. The Center has moved for summary judgment on both causes of action. For the reasons that follow, we grant the Center's motion.

## RELEVANT FACTS [1]

### A. Sanders Begins Working at the Center As a Probationary Employee

The Center provides substance abuse counseling to adult women through various programs, including the Pregnant Postpartum Women and Infants Unit ("PPWI Unit"). The PPWI Unit is a 24–hour inpatient treatment facility for women who are at least seven months pregnant or within sixty days postpartum. Def.'s Facts ¶¶ 4–5, 8. Sanders began working at the Center on May 9, 1994 as a Counselor I (Substance Abuse Counselor) for the PPWI Unit and held that position until her termination on September 13, 1995. *Id.* at ¶ 25. Sanders, like all new employees, was on probation for the first six months of her employment. *Id.*

at ¶ 100. During the probationary period, new employees must prove to their supervisors that they can perform their jobs with some proficiency. *Id.* at ¶ 101.

When Sanders interviewed at the Center, she neither was asked nor volunteered any information about her religion. *Id.* at ¶ 27. Sanders is a Seventh–Day Adventist, and has been since 1991. *Id.* at ¶ 23. Seventh–Day Adventists worship from sundown Friday to sundown Saturday, and are prohibited from working during that period. *See* Moore Dep. Ex. No. D000080. Nevertheless, while she was a probationary employee, Sanders occasionally worked on Fridays and Saturdays during her religion's time of worship. Def.'s Facts ¶ 30; Sanders Dep. Ex. No. 6. She also signed a Shift Change form that states, "I understand that after I accept this position from time to time my hours may change to meet the needs of the unit." Def.'s Facts ¶ 28.

Sanders' immediate supervisor for the first several months was Michelle Luckey. *Id.* at ¶ 32. On August 23, 1994, Luckey gave Sanders her First Quarter Performance Evaluation. *Id.* at ¶ 75; Sanders Dep.Ex. No. 9. Although Luckey noted that Sanders was precise about "time line, clinical documentation, and mechanics," she thought that Sanders' skills overall were "raw" and that she needed more experience and training in drafting client charts, interacting with clients, and conducting group therapy sessions. Pl.'s Add'l Facts ¶ 1; Def.'s Facts ¶ 78. Luckey's evaluation also addressed (for the second time that month) Sanders' failure to use clinically appropriate language in charting—an important skill because accurate documentation is both a condition of public funding and necessary for quality client care. Def.'s Facts ¶¶ 18, 73–74, 77. Finally, Luckey addressed Sanders' inability to maintain boundaries with clients. Sanders was "counter transferring," meaning that she initiated client interaction as if she were the client's mother. *Id.* at ¶ 79. Because the Center's clients usually have not experienced

1. The facts are derived from the parties' Local Rule 12(M)–(N) statements of fact and accompanying exhibits.

effective boundaries, a Counselor I must work hard to maintain them. *Id.* at ¶¶ 80–81.

In October 1994, Gwendolyn Moore, the PPWI's program director, met with Sanders to discuss two instances of Sanders' inappropriate behavior: giving a client her home telephone number and falsely representing herself as a Certified Alcohol or Drug Abuse Counselor by signing the initials "C.A.D.C." along with her name. *Id.* at ¶¶ 84–85. Around the same time, Moore began to notice that Sanders' charting was deficient in several respects. *Id.* at ¶ 87.

The problems Luckey and Moore addressed resurfaced on Sanders' six-month evaluation dated December 28, 1994.[2] *See* Sanders Dep.Ex. No. 10. The Center's employees are evaluated on a scale from "0" to "4," using "0" as the lowest rating and "4" as the highest. Def.'s Facts ¶ 89. A "1" rating indicates that an employee has occasionally, but not consistently, demonstrated skill and proficiency in a particular area. *Id.* at ¶ 90. In the Clinical Documentation and Writing Skills category, Luckey gave Sanders a "1" for her ability to use clinically appropriate terminology, and, under Individual Counseling, gave Sanders two "1"s for her abilities to maintain appropriate boundaries and to integrate all aspects of treatment into individual counseling sessions. *Id.* at ¶¶ 91–93. Sanders also received mostly "1" ratings in the Ethics and Boundaries and Group Counseling categories. *Id.* at ¶¶ 94–95. However, Sanders did receive "3" ratings (which indicate that an employee has demonstrated skill and proficiency) in a number of areas under the Client Intake and Assessment, Treatment Planning, Milieu Management, and Time Management Skills categories. Pl.'s Add'l Facts ¶¶ 6–8, 10; Sanders Dep.Ex. No. 10.

Sanders' ratings, while low in some areas, were apparently sufficient for an upgrade to permanent status. Luckey had voluntarily left the Center in February 1995 without telling Moore or Human Resources that Sanders had passed the probationary requirements. *Id.* at ¶¶ 104–105. Moore later found Sanders' six-month evaluation in Luck-

ey's desk, and contacted Human Resources on March 13, 1995 with the recommendation that Sanders be promoted to permanent status *Id.* at ¶¶ 106–107.

## B. Sanders Tells the Center About her Religion and Its Work Restrictions

During a PPWI Unit staff meeting in early March 1995, Moore announced that she might change work schedules for some employees, including Sanders, to accommodate the unit's needs. *Id.* at ¶ 35. Soon after the meeting, Sanders told Moore that she could not work on Fridays and Saturdays. *Id.* at ¶ 37. Moore subsequently decided not to change the staff schedules, and Sanders continued to work her regular shift, Sunday through Thursday. *Id.* at ¶ 38.

On March 21, 1995, Sanders gave Moore a note from Sanders' pastor. *Id.* at ¶ 39. The pastor explained that Sanders could not work from Friday at sunset to Saturday at sunset because the tenets of her religion, Seventh–Day Adventism, prohibited it. *Id.* It is undisputed that Moore was unaware of Sanders' religious affiliation before she received the pastor's note. *Id.* at ¶¶ 40–41. Moore took the note to Florence Wright, Clinical Director of the Center. *Id.* at ¶ 42. After talking to Wright, Moore was under the impression that she was to honor Sanders' days of worship, but that Sanders could still work on Fridays or Saturdays on an emergency basis—as she had done during her probationary period. *Id .* at ¶ 43.

A few months later, Moore assigned Sanders to work the evening shifts on Friday, May 26, and Saturday, May 27. *Id.* ¶ 46. Sanders gave Moore a note requesting removal from the Friday and Saturday evening shifts because of her religious beliefs. *Id.* at ¶ 47. After receiving Sanders' note, Moore changed the May schedule to accommodate Sanders' religious beliefs. *Id.* at ¶ 50. After that time, the Center never scheduled, requested, or required Sanders to work at any time between Friday at sunset to Saturday at sunset. *Id.* at ¶ 51.

---

**2.** Although December marked the end of Sanders' six-month probationary period, no decision

was made at this time on whether to promote Sanders to permanent status.

## C. The Center Puts Sanders on a 90–Day Disciplinary Probation

After Luckey's departure in February 1995, Linda Cole became Sanders' immediate supervisor. *Id.* at ¶¶ 114–115. She too observed problems with Sanders' work. *See* Def.'s Facts ¶¶ 114–117. For example, Cole documented that when she talked to Sanders about a client's deviation from a medical pass, Sanders responded that she was interested only in the clients assigned to her. Def.'s Facts ¶ 114; Cole Dep.Ex. No. D000113. Cole considered this response inappropriate because PPWI counselors are responsible for every client in the unit. *Id.* Sanders, however, denies that she said this to Cole. Pl.'s Facts ¶ 114; Sanders Aff. ¶ 10. In addition, after sitting in on one of Sanders' individual counseling sessions, Cole recorded that Sanders failed either to review the patient's treatment plan or to set goals for the patient to achieve. Def.'s Facts ¶ 115; Cole Dep.Ex. No. D000660–61. Sanders denies that Cole observed any of her individual sessions. Pl.'s Facts ¶ 115; Sanders Aff. ¶ 18. Finally, Cole admonished Sanders at one point for being less than honest in her dealings with clients. Def.'s Facts ¶ 117.

Moore says that she met with Sanders twice in February 1995 because the problems noted on her December 1994 evaluation persisted. Def.'s Facts ¶¶ 98–99. She testified that Sanders continued to violate boundaries—in particular, by selling popcorn to clients—and to display poor patient charting skills. *Id.* Moore documented these two meetings on clinical supervision forms, stating that she discussed these problems with Sanders and advised her about ways to improve. Moore Dep.Ex. No. D000459, D000461. Sanders, however, denies having any problems with boundaries or charting, and denies ever having met with Moore to address these issues. Pl.'s Facts ¶¶ 98–99; Sanders Aff. ¶¶ 8–9. She also points out that Moore was the one who initiated staff popcorn sales to clients, but later decided this conduct was inappropriate. Pl.'s Add'l Facts ¶ 12; Def.'s Resp. Add'l Facts ¶ 13.

Moore met separately with Wright and Cole in March 1995 to discuss Sanders' continued unprofessional conduct and inability to maintain boundaries with clients. *Id.* at ¶¶ 110–111. Cole and Moore agreed that Sanders needed to be put on disciplinary probation. *Id.* at ¶ 111. Wright, who had the final decision-making authority on all personnel matters, discussed Sanders' performance problems with the Human Resources Director. *Id.* at ¶¶ 13, 112. These conversations culminated in a decision to put Sanders on a 90–day disciplinary probation at the end of March 1995. *Id.* at ¶ 112. Sanders denies that Moore and Wright ever met with her to discuss the conduct that led to her probation. Pl.'s Facts ¶ 113; Sanders Aff. ¶ 11.

Indeed, Sanders claims that this probation was only the beginning of a course of unnecessary discipline, unwarranted criticism, and forced reorientation. As an example, Sanders offers a meeting that Moore arranged among Sanders, Cole, and Bridget Lee, another Counselor I on the PPWI Unit, after Lee complained that Sanders had revealed Lee's personal information to clients. Def.'s Facts ¶ 66. At the meeting, Lee and Sanders exchanged heated remarks: Lee criticized Sanders for having old shoes, an old style of dress, and an old-fashioned hairdo, while Sanders criticized Lee for wearing short skirts. *Id.* at ¶ 67. Moore says that she intervened when the argument escalated and told the counselors to sit down or she would call security. *Id.* However, Sanders claims that Moore neither interrupted nor told Lee and Sanders to sit down; instead, she says Moore let Lee speak her mind and told Sanders to "shut up." Pl.'s Facts ¶ 67.

Although Lee never mentioned Sanders' religion, Sanders points out that the Seventh–Day Adventist faith teaches simplicity is preferable when it comes to dress and appearance. Pl.'s Add'l Facts ¶ 17. But Sanders does not claim that Lee knew about her religion or its teachings. Sanders admits that nobody besides Lee commented on Sanders' appearance, and does not claim that anyone at the Center commented on her religious beliefs. Def.'s Facts ¶ 68.

Sanders also testified that she was forced to attend an orientation session with new employees, a humiliating experience, she

says, because she had to reintroduce herself to staff and act like a new employee. Pl.'s Facts ¶ 188; Sanders Dep. 76. But Moore claims that Sanders told her that she wanted the new employee training, which the Center had instituted after Sanders' starting date. Def.'s Facts ¶ 118.

Sanders next points to an April 1995 meeting in which she was criticized for violating boundaries by telling a client that another staff member, Michael Byrd, was married to a white woman. Def.'s Facts ¶ 120; Cole Dep., Ex. No. D000464. Sanders did not see this behavior as a boundary issue. Def.'s Facts ¶ 121; Cole Dep.Ex. No. D000464.

## D. Sanders Receives a Series of Formal Reprimands and a Second 90–Day Probation

The Center's disciplinary policy is to give an employee a verbal warning before a formal written reprimand, unless the behavior is so extreme that it warrants termination. Def.'s Facts ¶ 20. If the employee fails to change her behavior, then she receives a written Notice of Employee Reprimand. *Id.* The reprimand notifies the employee that any further infractions can lead to additional disciplinary action, including termination. *Id.*

Moore testified that she gave Sanders her first formal reprimand on April 24, 1995 for violating boundaries with clients. *Id.* at ¶ 125; Moore Dep.Ex. No. D000087. The reprimand states that after Sanders had been verbally warned not to reveal private staff discussions to a client, she accused a client of getting her in trouble with her supervisors. *Id.* While Sanders "admits the existence" of the reprimand, she denies ever receiving it and denies having confronted the client. Pl.'s Facts ¶ 125.

Moore stated that Sanders received her second formal reprimand on May 4, 1995 for revealing personal information about another staff member, Michael Byrd. Def.'s Facts ¶ 127; Moore Dep.Ex. No. D000088. The reprimand states that the "staff approached [Moore] stating personal information regarding [Byrd] had been disclosed to clients on the unit. [Moore] questioned a client concerning the personal information and client

stated that during an individual session on 5/3/95, [Sanders] informed her [about] this staff member's birthday. In doing so, [Sanders] violated staff confidentiality." Moore Dep.Ex. No. D000088. Sanders' breach of confidentiality was considered serious because Byrd, as the only male clinician on the PPWI Unit, was extremely careful about maintaining boundaries, and had specifically asked fellow staff members not to mention his birthday to any clients. Def.'s Facts ¶¶ 128–129, 131. While Sanders also "admits the existence" of this reprimand, she denies ever receiving it and denies having revealed Byrd's birthday to a client. Pl.'s Facts ¶ 127.

A few weeks later, Moore gave Sanders her third formal reprimand for poor milieu management (supervising clients during unstructured time periods such as meals). Def.'s Facts ¶¶ 134,136; Moore Dep.Ex. No. D000106. The reprimand states that two clients began arguing in the cafeteria on Sanders' watch, but "[Sanders] allowed the situation to escalate to the point where all the clients started to argue and threaten each other. The situation became so out of control that Chef Craig came out of the back kitchen area. He stated that [Sanders] did nothing … and was waiting to get on the elevator." Moore Dep.Ex. No. D000106. Moore remarked on the reprimand that she was afraid to leave Sanders alone with the clients because "the clients tend to do whatever they want when [Sanders] is here alone." *Id.* While Sanders admits that she received this reprimand, she denies that her milieu management was deficient. Pl.'s Facts ¶ 136.

The next day, Moore says that she gave Sanders her fourth formal reprimand for making inappropriate remarks to a client. Def.'s Facts ¶ 137; Moore Dep.Ex. No. D000513. The reprimand states that "it was reported by a staff member that [Sanders] made inappropriate remarks to a client. [Sanders was] quoted as stating to a client that [the client] was jealous because she had been replaced by another client. Additionally, [Sanders] stated that [the client] should stop walking around the unit shaking her butt. This language is perceived as being abusive conduct toward a client and is in

violation of Human Resource Policy." Moore Dep.Ex. No. D000513. While Sanders admits that she received this reprimand as well, she denies making any abusive or inappropriate remarks to a client.[3] Pl.'s Facts ¶ 137.

Sanders continued to exhibit performance problems during the summer of 1995. During a July clinical supervision meeting with Sanders, Moore discussed the lack of improvement in Sanders' individual counseling and documentation skills. Def.'s Facts ¶ 14. On a clinical supervision form, Moore stated that Sanders possessed "no skills when talking with her clients; it was closely related to a casual conversation held between two friends on a street corner. The language was slang . . . ." Moore Aff.Ex. No. 1. Moore also admonished Sanders for incorrectly documenting that a counseling session lasted on hour when it was actually twenty minutes long.[4] Id.; see Moore Dep.Ex. No. D000466.

The next week, Moore confronted Sanders about disciplining a client twice for the same incident. Def.'s Facts ¶ 144. Moore noted that after the client directly reported the incident to her, Moore spoke with Sanders and determined that Sanders had not properly counseled the client or documented the counseling. Moore Dep.Ex. No. D000603. These events prompted Moore's August 1, 1995 memorandum recommending a second 90–day probation for Sanders, based on her continuing inability to counsel clients properly in both individual and group sessions, as well as her constant problems with documentation. Id. at ¶ 145; Moore Dep.Ex. No. D000079.

### E. Sanders' Annual Evaluation, Final Reprimands, and Termination

Moore completed Sanders' annual review on August 3, 1995. Def.'s Facts ¶ 147. Moore testified that she and Sanders met to discuss the annual review and a self-evaluation that Sanders had completed earlier. Def.'s Resp. Add'l Facts ¶ 30; Moore Add'l Aff. ¶ 2. Moore gave Sanders mostly "1" ratings under all twelve criteria. Def.'s Facts ¶ 148; Moore Dep.Ex. No. D000093–99. This was a significant decline from Sanders' six-month evaluation. At this time, Moore also developed specific goals for Sanders. Def.'s Facts ¶ 151. Sanders refused to sign the evaluation form, stating that she believed the evaluation was unfair. Id. at ¶ 149.

In fact, Sanders insists that the August 3 evaluation was not the "real" evaluation. Pl.'s Add'l Facts ¶ 30–31. She claims that Moore and she jointly completed a favorable annual review in June, but Moore later retracted it and replaced it with the August 3 evaluation. Id. The record clearly shows, however, that this June evaluation was a self-evaluation in which Sanders alone reviewed her performance. See Moore Dep.Ex. No. D000619–624. Sanders' own assessment of her work at this time was generally in the "3" rating range, meaning she believed that she had consistently demonstrated skill and proficiency in most areas. Def.'s Facts ¶ 150; Moore Dep.Ex. No. D000619–624.

On September 7, 1995, Sanders received her fifth formal reprimand from Moore for failing to document clinical staffings—after receiving a verbal warning about the very same issue. Def.'s Facts ¶ 153; Moore Dep. Ex. No. D000083. While Sanders admits receiving this reprimand, she denies that her documentation was lacking. Pl.'s Facts ¶ 153.

On September 8, 1995, Sanders admits that she received her sixth and final formal reprimand for untimely documentation. Def.'s Facts ¶ 154; Moore Dep.Ex. No. D000084–85. The reprimand states that af-

---

3. Moore testified that she met with Sanders the same day to review Sanders' client charting problems. Def.'s Facts ¶ 133. On a clinical supervision form, Moore explained that Sanders needed to use more appropriate charting terminology, to document clinical notes more carefully, and to address individualized treatment issues. Moore Aff.Ex. No. 4.

4. Near the end of June 1995, the Center admits that Cole inappropriately admonished Sanders for failing to document any individual client sessions during that month. Def.'s Resp. Add'l Facts ¶ 141. The Center acknowledges that Sanders was on paid leave in June and therefore was not responsible for client charting. Def.'s Facts ¶ 27. Sanders did not receive a reprimand as a result of this incident, however, and the Center states that it did not factor into Sander's termination.

ter Moore discovered Sanders had not done any August documentation for "continuing stays" (clients that remained on the PPWI Unit), Moore instructed her on August 30 to complete the task in order to comply with federal and state regulations. Moore Dep. Ex. No. D000084. A week later, Sanders' charts were still not compliant. *Id.* Because the monthly site reviewer was coming to examine client charts, Moore asked Sanders to redo the charts by September 7, 1995. *Id.* When Moore rechecked Sanders' charts, the documentation was still incomplete. As a result, the site reviewer cited the Center for fourteen record keeping deficiencies. Moore Dep.Ex. No. D000085.

On September 13, 1995, Wright fired Sanders for unsatisfactory job performance. Def.'s Facts ¶ 154; Sanders Dep., Ex. No. 23.

### F. Sanders' Claims

After her termination, Sanders filed a charge with the EEOC. She received a notice of her right to sue, then filed suit in this Court. Sanders' first claim is that the Center terminated her because of her religion in violation of Title VII. She contends that after she informed Moore about her religious beliefs, her supervisors immediately and drastically changed the way they treated her by constantly writing her up, formally reprimanding her on six occasions, and placing her on probation twice before ultimately terminating her. Sanders maintains that Moore fabricated the written reprimands as a post-hoc justification for her firing. Second, Sanders claims that she was the victim of a hostile work environment because of her reli-

gion in violation of Title VII. As evidence, Sanders points to co-worker Bridget Lee's criticism of her appearance, her supervisors' repeated reprimands, and being forced to participate in a new employee orientation.[5] The Center contends that neither claim withstands summary judgment scrutiny.

### LEGAL STANDARDS

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court must view all evidence in a light most favorable to the non-moving party, and draw all inferences in the non-movant's favor. *See Wolf v. Buss America, Inc.*, 77 F.3d 914, 918 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). But if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1212 (7th Cir.1993).

In ascertaining whether a genuine issue of material fact exists, the court must "view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. 2505. If

---

5. Although Sanders' complaint asserts two additional grounds for her hostile environment claim—the Center scheduled her to work alone on some shifts and failed to promote her—we need not consider these issues because Sanders omitted them from her brief. *See Reidt v. County of Trempealeau,* 975 F.2d 1336, 1341 (7th Cir. 1992) (plaintiff waived disparate impact claim alleged in complaint because she did not fulfill her "minimal responsibility of identifying the applicable law and arguing why the facts ... fit into the parameters of that law."); *see also Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs,* 957 F.2d 302, 305 (7th Cir.1992) ("[W]e have no obligation to consider an issue that is ... not developed [ ] in a party's brief."). Moreover, neither allegation would support a hostile environment claim—or

any other theory of discrimination for that matter. The record shows that other counselors besides Sanders worked alone, and that the shifts that Sanders worked by herself (Sunday and Monday nights) required fewer counselors because they had less programming than other shifts and no visiting hours. As for Sanders' nonpromotion, the record demonstrates that she never applied for a higher position and that, of the two co-workers who did receive promotions, one was promoted to the Counselor I position that Sanders already held, and the other had positive performance reviews. Given our ultimate determination that Sanders' poor performance is a legitimate, nondiscriminatory, nonpretextual reason for her firing, any claim that Sanders' nonpromotion was discriminatory is spurious.

the "record taken as a whole could not lead the trier of fact to find for the non-moving party, there is no genuine issue of material fact for trial." *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, this Court's sole duty is to determine whether sufficient evidence exists to support a verdict in the non-movant's favor; credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of the judge deciding a motion for summary judgment. *See Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. These pronouncements apply with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993). Mindful of these standards, we examine Sanders' claims.

## ANALYSIS

### A. Religious Discrimination Based on Termination

▮▮▮ Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against their employees on the basis of religion. *See E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir.1997). Sanders

bears the ultimate burden of proving that her employment was adversely affected by her religion; she may sustain that burden with either direct or circumstantial evidence of discriminatory intent. *See Feldman v. AMR Corp.*, 1997 WL 30988, at *4 (N.D.Ill. Jan.22, 1997). When, as in Sanders' case, there is no direct evidence of discrimination,[6] the most common way to prove employment discrimination circumstantially is "by way of the burden-shifting approach first articulated in *McDonnell Douglas Corp.* [*v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ]." *O'Connor v. DePaul Univ.*, 123 F.3d 665, 669 (7th Cir.1997). To make out a prima facie Title VII case under *McDonnell Douglas'* indirect, burden-shifting approach, Sanders must show that: 1) she was a member of a protected class; 2) she performed her job satisfactorily; 3) she suffered an adverse employment action; and 4) she has evidence from which it can be inferred that the adverse action sprang from a "legally forbidden ground," for example, more favorable treatment of non–Seventh–Day–Adventist employees. *Feldman*, 1997 WL 30988, at * 4; *see also Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158–59 (7th Cir.1996).

If Sanders succeeds in making a prima facie showing of discrimination, a rebuttable presumption of discrimination arises and the

---

**6.** Sanders erroneously contends that she has direct evidence of religious discrimination. The Seventh Circuit defines direct evidence as "evidence which if believed by the trier of fact will prove the particular fact in question without reliance on inference or presumption." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997) (internal quotations and citations omitted). The evidence "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989). For Sanders to have a direct evidence case, she would have to point to facts demonstrating a direct link between her religious beliefs and an adverse employment action, such as disciplinary action overtly imposed for her inability to work on days of religious observance. *See, e.g., E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir.1997) (employer denied Jewish employees' request for day off to observe Yom Kippur and then fired them because they did not report to work). But no such facts appear in the record. Instead, Sanders' discriminatory termination claim depends entirely on inference: that

she was disciplined not for the reasons given by her supervisors, but because they had recently discovered she was a Seventh–Day Adventist and harbored a discriminatory animus toward persons of that faith. The facts in this case thus require the fact-finder to infer a link between discriminatory intent and the adverse action, whereas the hypothetical above does not.

It is important to note, however, that even if we did analyze Sanders' claim as a direct evidence case, it would still fail. The prima facie case differs slightly—Sanders would have to show that "the observance or practice conflicting with an employment requirement is religious in nature, that she called the religious observance or practice to her employer's attention, and that the religious observance or practice was the basis for her discharge or other discriminatory treatment." *Ilona*, 108 F.3d at 1575. But Sanders cannot get past the third factor. Because we find below that no reasonable juror could find that Sanders' religious observance was the basis for her discharge or any of the Center's disciplinary actions, she could not prevail under a direct framework.

burden of production shifts to the Center to articulate a legitimate, non-discriminatory reason for terminating Sanders. *See Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To meet this burden, the Center must produce admissible evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The Center is not required to persuade the Court that it was actually motivated by the proffered reason. *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089.

If the Center meets this burden, the presumption of discrimination dissolves and the burden of production shifts to Sanders to show that the proffered reason is a pretext for discrimination. *Id.* at 256, 101 S.Ct. 1089. Pretext can be established by showing (1) that discriminatory intent more likely than not motivated the employer; or (2) that "the employer's proffered explanation is unworthy of credence" because the defendant's explanation had no basis in fact, was not the real reason for the adverse action, or was insufficient to justify any adverse action. *See Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir. 1995); *Lenoir v. Roll Coater,* 13 F.3d 1130, 1133 (7th Cir.1994).

The Center offers two alternate grounds in support of its motion for summary judgment on Sanders' discriminatory termination claim. First, it argues that Sanders cannot satisfy the second and fourth prongs of her prima facie case. The Center contends that Sanders' work performance was unsatisfactory at the time of her termination, and that Sanders cannot point to any similarly situated employee outside her protected class who was treated more favorably than she. Second, the Center argues that even if Sanders has established a prima facie case, she has not produced evidence from which a reasonable fact finder could infer that the Center's proffered reason for her termination—poor job performance—was a pretext for discrimination. Because we agree with the Center's second contention, summary judgment is appropriate.

A court is free to assume that the plaintiff has established a prima facie case under *McDonnell Douglas* and proceed directly to whether she has adduced sufficient evidence to raise a triable issue of pretext. *See EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 149–50 (7th Cir.1996) (noting that a "court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a prima facie case," and "[t]o expedite the process it may be preferable to get past the prima facie case and examine the pertinent issue of whether there was discrimination in a job action"). This is in line with the well-established principle that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff did so is no longer relevant." *United Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

The Court finds that the Center has produced admissible evidence of a nondiscriminatory reason for Sanders' termination—consistently poor work performance as shown by evaluations, reprimands, and testimony. Both of Sanders' immediate supervisors, Michelle Luckey and Linda Cole, testified that Sanders' skills as a Counselor I on the PPWI Unit were lacking in several respects—most notably, in the areas of client interaction, counseling, and clinical documentation. While Luckey rated Sanders positively in a few areas on Sanders' six-month evaluation, she rated Sanders poorly in several more: Clinical Documentation and Writing Skills, Individual Counseling, Ethics and Boundaries, and Group Counseling. In the months following Sanders' six-month evaluation, Moore testified that Sanders continued to have performance problems in these very same categories, and that she met with Sanders on many occasions to discuss her deficiencies. When Sanders failed to improve, Wright placed Sanders on disciplinary probation twice. The Center provides ample documentary evidence of these supervisors' contemporaneous observations of and reasons

for their dissatisfaction with Sanders' performance.

Significantly, Sanders also received six reprimands—for violating the Center's confidentiality rules, improper interactions with clients, and inadequate documentation—the last of which was issued just before she was fired. And Sanders' Annual Review conducted just one month before her termination shows poor marks in all categories. In short, the Center presents evidence that Sanders exhibited the same performance problems throughout her employment, and that they got worse instead of better, reaching their peak in August–September 1995.

▮ The Center's belief that Sanders did not perform up to expectations is a legitimate, nondiscriminatory reason for Sanders' termination. *See Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir.1992). Sanders must now raise a genuine issue of fact as to whether this reason is merely a pretext for religious discrimination. It is not sufficient for Sanders to show that her termination was unfair or undesirable; rather, Sanders must show that the Center did not honestly believe that Sanders was performing poorly at the time of her discharge. *See Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 891 (7th Cir.1997); *see also Anderson*, 965 F.2d at 402 (as long as the defendant honestly believes that the employee is not meeting legitimate expectations, termination is justified).

Sanders first attempts to establish pretext by showing that a discriminatory reason more likely than not motivated the Center's decision to begin a course of discipline that led to her termination. Specifically, Sanders claims that her supervisors drastically changed the way they treated her once they learned in March 1995 that she was a Seventh–Day Adventist. In support of this contention, Sanders points out that before the revelation about her religious beliefs, she had been promoted to permanent status, had received no reprimands, and had never been placed on disciplinary probation, but that shortly after the Center learned about her religion, she received six different reprimands and was placed on probation twice before ultimately being terminated.

This Court finds that no reasonable juror could conclude from these facts that the Center's course of discipline beginning in March 1995 and ending with Sanders' termination in September was a pretext for religious discrimination. Most significant is the fact that the Center fully accommodated Sanders' religious beliefs once it learned about them. Although Moore scheduled Sanders to work once during her time of religious observance—based on the fact that Sanders had willingly done so on an as-needed basis when she first started working at the Center—she immediately removed Sanders from these shifts upon request and thereafter never asked Sanders to work shifts that conflicted with her times of worship. Moreover, no one at the Center ever commented, negatively or otherwise, on Sanders' religious status.

Additionally, the Center has provided ample evidence that before Sanders revealed her religious status, her supervisors explained that she needed to improve her charting, client interaction, and counseling skills. The evidence also shows that Sanders made no attempt to do so and, indeed, began to show deficient performance in other areas. In August 1994, Luckey pointed out deficiencies in Sanders' ability to maintain boundaries, clinical documentation skills, and counseling skills. Around the same time, Moore began to notice problems with Sanders' charting. All these performance problems surfaced on Sanders' December 1994 evaluation. Between February and March 1995, Moore met with Sanders twice to discuss instances of inappropriate client interaction and poor patient charting. In March 1995, Cole admonished Sanders about improper client supervision, failure to review a treatment plan and set goals during a counseling session, and being dishonest with clients. Six reprimands and a second probation followed, based on Sanders' violation of client boundaries, the Center's confidentiality rules, improper client interaction and supervision, and improper documentation. Sanders was finally terminated when her improper documentation resulted in the Center's being cited for fourteen record keeping violations.

Sanders retorts simply that she never committed these errors and that neither Moore

nor Cole discussed them with her. She also points out that the Center never reprimanded her for exhibiting these problems until after she told them her religious status. Neither of these points raises an issue as to pretext.

First, Sanders' bare denials do not call into question the honesty of Moore and Cole's beliefs that Sanders' deficiencies in client interaction, documentation, and counseling justified putting her on probation in March 1995, or that Sanders' continuing problems in these areas warranted further disciplinary action throughout 1995, including termination. It is well-established that "[t]he employee's perception of [herself] ... is not relevant. It is the perception of the decision maker which is relevant."*Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 338 (7th Cir.1991) (internal quotations and citations omitted). Sanders' simple insistence that she never did or said the things that Moore and Cole documented is insufficient to create a fact issue as to pretext because she does not present specific facts that cast doubt on their *belief* that she engaged in this conduct. *See McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers."); *Karazanos*, 948 F.2d at 337–38 (employee "must do more than challenge the judgment of his superiors through his own self-interested assertions") (internal quotations and citations omitted).

In short, Sanders' mere disagreement with the accuracy of Moore and Cole's perceptions does not cast doubt on their honesty. *See Gustovich v. AT & T Communications*, 972 F.2d 845, 848 (7th Cir.1992) (the question is not whether the employer's reasons for a decision are right, but whether the employer's description of its reasons is honest); *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir.1987) ("[A] reason honestly described but poorly founded is not a pretext, as that term is used in the law of discrimination.").

Second, in order to call into question Moore and Cole's perceptions that she exhibited deficiencies in client interaction, counseling, and patient charting (among other areas) sufficient to warrant two probations, six reprimands, and termination, Sanders must present proof of adequate performance in these areas. *Anderson*, 965 F.2d at 404 n. 2 (when employer's reason for adverse action is poor performance in a particular area, "the plaintiff seeking to prove pretext must demonstrate adequate performance in that area."); *LaMontagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1414 (7th Cir.1984) ("[T]o show pretext, it does not help for [the plaintiff] to repeat the proof that his job performance was generally satisfactory.... The Company advanced specific reasons for his discharge, and his rebuttal should be focused on them."). Sanders does not even attempt to so this; she relies instead on some positive ratings in other areas in her six-month evaluation conducted in December 1994. This, however, is not relevant to employer perceptions and disciplinary action taken between late March and September 1995 as a result of continuously poor performance in areas already noted as deficient on the December 1994 evaluation.

Similarly, the lack of disciplinary action before March 1995 does not aid Sanders because the Center was entitled to expect improvement once her supervisors brought these deficiencies to Sanders' attention in 1994. The Center was also entitled to give Sanders the benefit of the doubt as a new, probationary employee, and to demand better performance once Sanders achieved permanent status in mid–March 1995. The record therefore shows that there was no "suspicious timing" or "drastic change" in the way Sanders' supervisors treated her after she told them about her religious beliefs, only Sanders' refusal to remedy known deficiencies.

Next, Sanders attempts to establish pretext by arguing that the Center's proffered explanation of poor work performance is not credible because it has no basis in fact. Specifically, Sanders challenges the credibility of the employees who testified on behalf of the Center and the authenticity of many of

Moore's reprimands. Sanders claims that (1) the Center's employees (i.e., Luckey, Cole Moore, and Wright) stood to gain by testifying for their employer, raising an issue as to whether their testimony is truthful; (2) that her supervisors' perceptions are questionable because they were based on employee reports rather than third-party complaints from outside the Center; and (3) that several of Sanders' reprimands were fabricated as a post-hoc justification for her termination, casting doubt on the Center's honest belief in the reasons for Sanders' termination.

▆ These arguments have no merit. As to the first point, Sanders must do more than simply raise the possible motive of employee self-interest in testifying for the Center to defeat summary judgment. Because Sanders does not point to any specific facts shedding doubt on the truth of any testimony given by Center employees, her mere assertion that self-interest could have caused them to lie is pure speculation, and "speculation is not enough to avoid summary judgment." *Anderson*, 965 F.2d at 402. This contention rings especially hollow when applied to Luckey, who no longer worked for the Center when she testified.

▆ With regard to the second point, nothing in the law requires employer perceptions or adverse job actions to be based on third-party complaints, as opposed to the observations of supervisors and co-workers. Such a requirement would be especially ludicrous to impose on an employer such as the Center, which has no "outside" third party clients—only inpatient clients with whom confidentiality must be strictly maintained. The only way for the Center to demonstrate Sanders' poor performance is to present the testimony of those who witnessed it—Sanders' supervisors, co-workers, and clients. The record shows that reports of Sanders' poor performance came not only from supervisors Luckey, Cole, Moore and Wright, but also from PPWI clients themselves—the closest parallel to objective "third parties."

▆ Finally, Sanders' attack on the authenticity of Moore's reprimands fails because she does not point to any facts that show either the reprimands or the complaints underlying them were fabricated. In *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397 (7th Cir.1992), the Seventh Circuit explained what is required to raise a fact issue as to pretext by alleging fabricated evidence of poor performance:

> The problem with Anderson's theory is that he has failed to produce any factual evidence indicating that the complaints against him were fabricated or unfounded. His theory that Lacey's memos and the complaint letters were manufactured in an attempt to justify his firing is, at best, speculation, and speculation is not enough to avoid summary judgment.

*Id.* at 402.

Sanders' claims that the Center fabricated two of the reprimands, and that three of the remaining four were based on inaccurate employer perceptions, are equally speculative and insufficient to avoid summary judgment. Sanders cannot point to anything in the record that would suggest the first two reprimands (both for violating staff confidentiality) were fabricated. Nor does she point to specific facts showing that the first five reprimands were the product of dishonest beliefs about Sanders' poor performance. Three of the first five reprimands were expressly based on reports of clients or co-workers— none of whom Moore had any reason to doubt.[7] And, as noted above, Sanders fails to present specific facts showing good performance in the areas that the reprimands noted were deficient. *See Anderson*, 965 F.2d at 403 ("unless [plaintiff] attacks the specific reasons given for a termination, a plaintiff who stresses evidence of satisfactory performance is simply challenging the wisdom of the employer's decision, which we have consistently refused to review.").

Most important, Sanders concedes both the authenticity of and the deficient behavior underlying the sixth reprimand, which Moore issued for Sanders' repeated failure to make

---

7. The second reprimand for violating client confidentiality was based on a client's report; the third reprimand for poor milieu management in the cafeteria was based on Chef Craig's account; and the fourth reprimand for abusive conduct toward clients came from a co-worker's report.

her documentation compliant with state and federal regulations. This alone is sufficient to support Sanders' termination, especially since Sanders' poor documentation led directly to fourteen regulatory citations against the Center for record keeping violations. *See Wolf v. Buss America, Inc.,* 77 F.3d 914, 920 (7th Cir.1996) (in order to withstand summary judgment, plaintiff must raise a fact issue challenging the integrity of each reason the employer presents for termination); *Anderson,* 965 F.2d at 401 (it is employee's performance at the time of discharge that is relevant).

Therefore, we must grant summary judgment to the Center on Sanders' discriminatory termination claim because Sanders has failed to raise a triable issue as to whether her discipline or termination was a pretext for religious discrimination.

### B. Religious Discrimination Based on Hostile Environment

Sanders also claims that the Center subjected her to a hostile work environment by criticizing her appearance, repeatedly reprimanding her for trivial matters, and forcing her to participate in a new employee orientation. To prevail on a hostile environment claim under Title VII, Sanders must show that she was subjected to conduct that unreasonably interfered with her work performance or created an intimidating, hostile, or offensive work environment. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The harassment must be sufficiently severe or pervasive to alter the conditions of Sander's employment and create an abusive working environment. *Id.* at 67, 106 S.Ct. 2399; *see also Burlington Indus. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (retaining distinction between hostile environment and quid pro quo harassment for purposes of determining whether any "harassment preceding the employment decision [is] actionable"; and holding that "the conduct must be severe or pervasive" to be actionable). Furthermore, while the hostile environment need not be psychologically injurious, "relatively isolated instances of non-severe misconduct will not support a hostile

environment claim." *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 533 (7th Cir. 1993).

This Court finds that the record does not support Sanders' hostile environment claim. First, the one instance in which co-worker Bridget Lee criticized Sanders' appearance during a meeting with Moore does not amount to harassment. Sanders admits that Lee and she both exchanged negative comments and that nobody besides Lee commented on her appearance. More important, Lee did not mention or in any way disparage Sanders' religion in criticizing Sanders' dress. Sanders does not claim that Lee even knew about her religion, much less its teachings. Even assuming the truth of Sanders' account that Moore failed to intervene and told Sanders to shut up while allowing Lee to talk, this incident cannot be characterized as anything more than an isolated instance of non-severe misconduct.

Nor do the reprimands that Sanders received constitute harassment. We have already found that these six reprimands (for violation of professional boundaries, violation of staff confidentiality, poor milieu management, abusive conduct towards a client, and inadequate documentation) were based on Sanders' supervisors' honest beliefs. The reprimands cannot be described as "trivial" or harassing because they addressed serious deficiencies in Sanders' duties as a counselor on the PPWI Unit. As such, no reasonable juror would find that the reprimands amounted to any kind of employer misconduct, much less created a hostile, offensive, or intimidating work environment. The record shows that Sanders brought the reprimands on herself through poor performance.

Finally, Sanders' participation in a new employee orientation does not rise to the level of harassment either. Although Sanders claims that she was forced to participate in the orientation, rather than requesting to participate as the Center claims, she provides no factual support for her contention. Even if the Center did force her to participate, this one incident would not be sufficiently severe or pervasive as to change the conditions of Sanders' environment. Because Sanders fails to raise a fact issue as to the existence

of a hostile environment based on her religion, we grant the Center's motion for summary judgment on this cause of action as well.

## CONCLUSION

For the reasons set forth above, we grant summary judgment to the defendant. The Clerk of the Court is hereby instructed to enter judgment, pursuant to Fed.R.Civ.P. 58, in favor of the defendant, The Women's Treatment Center, and against the plaintiff, Doris Sanders.