**Marlow ANDERSON, Plaintiff–Appellant,**

**v.**

**STAUFFER CHEMICAL COMPANY, Defendant–Appellee.**

No. 91–1173.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1991.

Decided June 8, 1992.

John L. Olson (argued), Gregory E. Barrett, Schlueter, Ecklund, Olson, Barrett & Mayfield, Rockford, Ill., for plaintiff-appellant.

Janet M. Hedrick (argued), Richard H. Schnadig, Bruce R. Alper, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant-appellee.

Before COFFEY and RIPPLE, Circuit Judges, and WISDOM, Senior Circuit Judge.[*]

COFFEY, Circuit Judge.

Stauffer Chemical Company (Stauffer) fired Marlow Anderson, its District Manager in Northern Illinois, in May of 1985. Anderson then sued Stauffer, alleging that his discharge violated the Age Discrimination in Employment Act (ADEA). 29 U.S.C. §§ 621–634. The district court granted summary judgment in favor of Stauffer and denied Anderson's motion for reconsideration. We affirm.

## BACKGROUND

Stauffer manufactures agricultural chemicals and sells them to local dealers through its sales representatives. Anderson began work as a Stauffer sales representative in 1968, and in 1972 was promoted to the position of District Manager, overseeing a number of sales representatives in his district. Anderson's immediate superior in the Stauffer hierarchy was Jerry Lacey, the Regional Sales Manager. During the winter of 1983–84, Lacey received unsolicited complaints about Anderson from sales representatives and dealers. In general, the sales representatives found him difficult to work for, claiming that he intervened in their work and prevented them from accomplishing sales goals. The dealers also had a variety of problems with Anderson, the most pervasive being his handling of complaints from the dealers' customers. Stauffer was having problems with some of its chemicals not performing as represented, and when the farmers would register complaints with the dealers about the products' nonperformance, the dealers looked to Stauffer's sales representatives and Anderson to resolve the complaints. Following company policy, Anderson settled most of these complaints by giving replacement products to the farmer, rather than cash, because this was cheaper for the company. The dealers disliked this method, however, preferring to have claims settled with cash, so that the farmer would have to come back and buy replacement products from them. Anderson's use of products angered both the dealers and the sales representatives, who wanted to keep the dealers happy and satisfied with Stauffer. In addition, some dealers and sales representatives also expressed a personal dislike or lack of respect for Anderson.

Lacey met with Anderson in June of 1984 to discuss these complaints. He explained to Anderson that good customer relations and working relationships with his subordinates were important for business and offered to find courses or seminars through which Anderson could improve his communication skills. Anderson failed to avail himself of the opportunity to take any courses or seminars, and attempted to explain away or rationalize the complaints, rather than confronting the problem.

* Judge John Minor Wisdom, of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

Two months later, in August of 1984, Lacey received a letter from Ken Gibson, a sales representative in Anderson's district. In the letter Gibson stated that he was resigning from Stauffer and proceeded to give his reasons.

> To be quite honest there is only one main reason for my leaving—Mr. *Marlow Anderson.* I simply refuse to be supervised by someone who I have no respect for as a person.... Mr. Anderson is extremely *bad* in my opinion, at dealing with dealers and growers[.]

R.Doc. 38, Ex. 3 (emphasis in original). Gibson also stated that dealers in his area had directly asked him to avoid using Anderson to handle customers' complaints, preferring to have him go directly to Lacey.

In September Lacey met with Anderson again to discuss Gibson's criticisms, which had reaffirmed the substance of the earlier complaints. Lacey told Anderson that the complaints revealed a definite problem, one going beyond a few scattered grievances, and that it needed to be addressed and improved or there would have to be "some action" regarding his employment. As before, he offered to enroll Anderson in a course or seminar to improve his interpersonal skills, but Anderson declined, again attempting to rationalize the complaints against him.

On December 12, 1984, Lacey met with Anderson to discuss his most recent annual performance evaluation, covering the period from October 1, 1983 to September 30, 1984. In the "Overall Performance" section of this evaluation Lacey gave Anderson a 4 on a 7–point scale. According to instructions accompanying the evaluation form, this meant: "Overall performance meets the requirements of the job— employee doing the job well." In a separate section of the evaluation, titled "Performance Factors and Development Needs," Lacey gave Anderson positive ratings in nine areas, neutral ratings in five, and negative ratings in four.[1] The nega-

tive ratings indicated that he needed to improve in four areas: job knowledge, planning skills, leadership, and work relationships. As to leadership, Lacey wrote of Anderson: "Delegates some responsibilities, needs to work hard on coaching techniques." R.Doc. 38, Ex. 5. Regarding work relationships, Lacey wrote that he "Question[ed] the level of respect [Anderson] has among his subordinates." *Id.* Anderson and Lacey went through the evaluation line by line, discussing both the good areas and the need for improvement. Lacey stressed that Anderson still needed to work on his relationships with dealers and sales representatives. Around this time, Anderson also received a ten-percent raise, effective at the start of the new year.

In February of 1985, Lacey received a letter from Stauffer's national sales manager, James Wissmiller. Wissmiller informed Lacey that he had recently met with dealers from Anderson's territory who were "very dissatisfied" with Anderson and "wondered how long Stauffer would put up with him." *Id.*, Ex. 7. Less than a month later, Lacey received letters from sales representatives in Anderson's area, detailing personality conflicts between Anderson and dealers, failures by Anderson to analyze problems or resolve complaints, broken promises made by Anderson, and a general belief that Anderson was costing Stauffer business.

Based on the continued complaints and Anderson's lack of improvement, Lacey decided to discharge him. On May 1, 1985, Lacey, Wissmiller, and Peter Tullsen, the Regional Employee Relations Manager, met with Anderson, informing him that his employment was being terminated because of performance problems. They gave Anderson the opportunity to resign, which he did, receiving a lump severance payment equivalent to a continuation of his salary through October 10, 1985.

In November of 1987, Anderson filed a complaint against Stauffer, alleging that

---

**1.** The "Performance Factors" section of the evaluation form directs the evaluator to give a " + " rating in areas where "the employee is strong", a " − " rating where "the employee shows need for improvement", and a "0" rating "if employee is average." R.Doc. 38, Ex. 5. Anderson received nine " + " ratings, four " 68 " ratings, and five "0" ratings in 1984.

he had been discharged because of his age, in violation of the ADEA. The district court granted Stauffer summary judgment, giving alternative reasons for its decision. "[P]laintiff either did not meet his employer's legitimate expectations regarding his job performance (no prima facie case established) or defendant has articulated a legitimate non-discriminatory reason for the employment action which plaintiff has failed to adequately rebut by showing pretext." Memorandum Opinion and Order, R.Doc. 43, at 7. Anderson moved for a reconsideration of the decision, but the court denied the motion, reiterating its holding that Anderson had not raised a genuine issue as to whether Stauffer's purported reasons for firing him were a mere pretext for discrimination. "In sum, Plaintiff has failed to present sufficient evidence to rebut defendant's stated reasons for Plaintiff's dismissal. In fact, the record is virtually devoid of any evidence that would rebut Defendant's stated reasons." Order, R.Doc. 53, at 2.

## DISCUSSION

The sole issue on appeal is the propriety of the district court's grant of summary judgment. We review summary judgment orders *de novo*, viewing the record and all reasonable inferences drawn from it in the light most favorable to the party opposing the motion. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991). Summary judgment is appropriate only when the materials before the court demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In other words, the record must reveal that "no reasonable jury could find for the non-moving party." *Karazanos*, 948 F.2d at 335.

To prevail on an ADEA claim, the plaintiff must ultimately prove that she was discharged because of her age. *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984). The plaintiff need not prove that the employer was motivated by age *alone*, how-

ever; it is enough that age was a "determining factor" or a "but for" element in the employer's decision. *Id.* Either of two paths may be followed in proving age discrimination. First, the plaintiff may present direct evidence that age was a determining factor in the discharge. Often, however, such evidence is unavailable, and plaintiffs rely on the second method of proof, the burden-shifting method borrowed from Title VII cases and originally established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This method places the initial burden on the plaintiff to establish a prima facie case. If the plaintiff clears this hurdle, the burden of production (not proof—that remains with the plaintiff throughout) shifts to the defendant, which must "articulate a legitimate, nondiscriminatory reason for the employee's discharge." *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 427 (7th Cir.1989). If the defendant succeeds, the ultimate burden is with the plaintiff, who must prove that the employer's proffered reason is a mere pretext for discrimination. *Id.* To expose the employer's reason as forming a mere pretext for discrimination, the plaintiff may show that a discriminatory reason was more likely to have motivated the employer than the reason given, or that the employer's explanation is not credible. *Oxman v. WLS–TV*, 846 F.2d 448, 456 (7th Cir.1988).

Anderson attempted to prove his case using the *McDonnell Douglas* approach. Given this framework, the question before us is whether Anderson can make out a prima facie case and, if so, whether he has raised a genuine issue of material fact as to whether Stauffer's proffered reason for firing him was a pretext.

To establish a prima facie case under the ADEA, a plaintiff must demonstrate (1) that he was a member of the protected class, (2) that he was doing his job well enough to meet his employer's legitimate expectations, (3) that he was discharged anyway, and (4) that the employer sought a replacement for him. *La Montagne*, 750 F.2d at 1409. Neither party disputes that Anderson can establish sections (1), (3), and

(4) (he was over forty years old, he was forced to resign, and he was replaced by a man seventeen years his junior), but they disagree over whether Anderson was doing his job well enough to meet Stauffer's legitimate expectations. For his part, Anderson finds evidence of his satisfactory performance in two areas: his 1984 annual review and his 1985 pay raise. In the 1984 review Anderson received an overall rating of 4 on a scale of 7, meaning he was "doing the job well" according to Stauffer's own system. And even though he received negative ratings on four specific "Performance Factors," he received positive ratings on nine factors and neutral ratings on five. Further, he received a ten-percent raise at the start of 1985, less than a month after receiving this evaluation. Neither party produced evidence as to how this increase in pay compares to the raises of other District Managers, or, indeed, if those employees received raises at all, but Anderson maintains that a raise of this size must have been merit-based, because it was clearly more than a mere cost-of-living allowance.

In response, Stauffer correctly notes that its opinion of Anderson in late 1984 is not determinative. What matters is whether Anderson was meeting his employer's expectations *at the time of the discharge*— May 1, 1985. *Karazanos*, 948 F.2d at 336. Assuming for the moment that the evaluation and raise meant that Anderson was meeting his employer's expectations through December of 1984, the question becomes whether anything happened between that time and May 1, 1985, when Lacey terminated his employment, to indicate that Anderson was no longer meeting Stauffer's legitimate expectations. Up to and including Lacey's meeting with Anderson on December 12, 1984, he had received complaints about Anderson from sales representatives and dealers, seen one sales representative quit because of Anderson, and met with Anderson three times to discuss the ongoing problem. Between that meeting and Anderson's subsequent discharge two things happened that might have changed Lacey's outlook. First, he received a letter from his superi-or, Jerry Wissmiller, mentioning complaints that dealers had made to him about Anderson on his recent trip though the area. Next, in March of 1985, Lacey received lengthy letters from his assistant and two sales representatives under Anderson, all describing numerous instances where Anderson had treated either sales representatives or dealers in an improper fashion and possibly cost Stauffer some business. The fact is, however, that the bulk of all these letters told Lacey what he already knew from his past conversations with dealers and sales representatives. Perhaps the letters indicated that Anderson had not improved the situation since December, but that is all. If Anderson was meeting the company's expectations in December of 1984, then, and the letters simply indicated that the same problem was continuing, it is at least arguable that he was meeting Stauffer's expectations at the time of his termination. Thus, taking all inferences in the light most favorable to the non-movant, it seems that there is at least an issue as to whether Anderson could make a prima facie case.

■ Assuming that Anderson can make a prima facie case, the burden then shifts to Stauffer to come up with a nondiscriminatory reason for Lacey's decision. Lacey claims that he fired Anderson because of his poor performance, including his inability to get along with his subordinates or develop good relationships with dealers, and his refusal to admit that there was a problem or take steps to correct it. He had discussed the problem with Anderson numerous times and clearly stated the need for improvement, but when things did not improve and complaints continued to accumulate, he found it necessary to terminate Anderson for the good of the company. This is a legitimate, non-discriminatory reason for discharging an employee. Thus, the ultimate burden is on Anderson to show that there is some genuine issue as to whether the stated reasons form a pretext for age-based discrimination.

■ As noted earlier, a plaintiff in an age discrimination case may prove that the proffered reason for her termination was a

mere pretext "by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *La Montagne,* 750 F.2d at 1414; *see also Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1422 (7th Cir.1992) (to prove pretext, the plaintiff must show that the employer "made up" its reason for the discharge). Attempting to do so, Anderson first argues that the proffered reasons for his discharge are unbelievable, challenging the credibility of Lacey's deposition responses and the legitimacy of the "paper trail" used to justify his firing. At his 1988 deposition Lacey claimed to have received numerous complaints about Anderson but could not recall exactly who made the complaints, or when, or the specific facts surrounding each complaint. Anderson believes that this vagueness as to the key details leading to his discharge calls Lacey's veracity into question, or at least raises some issue as to whether Lacey's reasons had any factual basis. Further, Anderson finds it quite curious that the memos Lacey allegedly prepared immediately after each of their three meetings in 1984, detailing their discussions, are all written on non-letterhead paper, have the dates and signatures in the same places, have identical margins, and are free of typos. How can this be, he asks, unless the memos were actually prepared on a single occasion, after the third meeting, in a devious attempt to create an artificial "paper trail" for Stauffer to rely on in defending this litigation? Equally suspicious (again, according to Anderson) is the fact that the three letters Lacey received from sales representatives complaining about him all arrived during a three-day span in March of 1985, just over a month before he was fired. Coincidence? He thinks not. Rather, he believes that these letters must have been solicited by Lacey in order to fortify the "paper trail" supporting his decision to fire Anderson.

The problem with Anderson's theory is that he has failed to produce any factual evidence indicating that the complaints against him were fabricated or unfounded. His theory that Lacey's memos and the complaint letters were manufactured in an attempt to justify his firing is, at best, speculation, and speculation is not enough to avoid summary judgment. *Karazanos,* 948 F.2d at 337. More, his theory is substantially undermined by his admission that Lacey personally discussed the complaints with him long before the letters were written, indicating that they were not "made up." Even if Anderson's allegations are true, and Lacey did solicit the complaint letters and write his memos at one sitting, the fact remains that there were complaints and Lacey claimed to have based his decision on the complaints and Anderson's failure to remedy the problem. So long as Lacey honestly believed that Anderson had problems with dealers and sales representatives that he was doing nothing to correct, the termination was certainly justified. *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992) ("[T]he issue of pretext ... addresses the issue of whether the employer honestly believes in the reasons it offers.").

■ Alternatively, Anderson contends that Lacey's reasons are a pretext for discrimination because they did not really motivate the discharge or were jointly insufficient to motivate the discharge. *See La Montagne,* 750 F.2d at 1415. He bases this contention on two facts. First, that Lacey did not follow Stauffer's usual practice of dealing with employee's problems through progressive discipline, and second, that just five months before firing him, Lacey gave Anderson a 4 on his annual evaluation, meaning he was "doing the job well," and a ten-percent raise. If there really had been a problem with his performance, Anderson contends, Lacey would have followed Stauffer's progressive discipline policy and also would have given him a worse evaluation and/or no raise. He argues that Lacey's failure to do these things must mean that his alleged problem was not serious enough to justify his termination, and so is a pretext for discrimination.

Stauffer's policy for dealing with employee's poor work habits was that "The most effective disciplinary action is taken in several stages. The first stage usually

consists of disciplinary action which is not severe, such as a written warning. In further discussions you utilize more severe actions, such as suspension, probation or termination." R.Doc. 41, Ex. 24. True, Lacey did not strictly follow this progression in dealing with Anderson, who maintains that this neglect of company policy demonstrates that he was terminated for something other than poor performance, namely, his age. Lacey, however, was not *required* to utilize progressive discipline. Moreover, even though he did not follow the suggested procedure by, for example, first giving Anderson a written warning, then suspending him or putting him on probation, and then discharging him, the purpose of progressive discipline—to give the employee adequate notice and an opportunity to correct any deficiencies—was fulfilled. Lacey met with Anderson three times in six months to discuss the complaints lodged against him and the need for improvement. At the second meeting, in September of 1984, Lacey made it clear that if Anderson did not improve his relationships with his dealers and subordinates, some action would be taken with regard to his employment. Although Lacey did not specifically mention that Anderson could be fired, we believe that when a supervisor pulls an employee aside to discuss a problem on three separate occasions, the employee ought to understand that the problem is serious, and it is incumbent upon the employee to take steps to improve his employment situation. Because Anderson has failed to demonstrate that Lacey viewed his problem as minor or neglected to devote appropriate attention to it, his pretext argument fails. A plaintiff attempting to prove pretext must raise some doubt as to the genuineness of the given reasons for a termination. *See Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1223 (7th Cir. 1991).

Similarly, Anderson's evaluation and raise cannot be used as evidence of pretext because at the same time he was conferring these "benefits" Lacey also told Anderson, for the third time, that there had been numerous complaints about him and that he should seek to improve his working relationships. The fact that an employee does some things well does not mean that any reason given for his firing is a pretext for discrimination. Further, "to show pretext, it does not help for [the plaintiff] to repeat the proof that his job performance was generally satisfactory. That question has already been resolved in his favor. The Company advanced specific reasons for his discharge, and his rebuttal evidence should be focused on them." *Aungst*, 937 F.2d at 1223, quoting *La Montagne*, 750 F.2d at 1414. Unless he attacks the specific reasons given for a termination, a plaintiff who stresses evidence of satisfactory performance is simply challenging the wisdom of the employer's decision, which we have consistently refused to review.[2] *See Castleman*, 959 F.2d 1417, 1422 ("Neither the jury nor this Court is empowered to act as a 'super-personnel department' and decide if [a] firing was unwise or unjustified.") We faced a similar claim in *Aungst*, where the plaintiff received a merit pay increase and a letter of recommendation shortly before his discharge. The plaintiff attempted to use this to show pretext, but we rejected the claim because "none of these pieces of evidence responds to [the employer's] reasons for terminating him—the need for versatility in the context of a reduction in force." 937 F.2d at 1223. Likewise, in *La Montagne* the plaintiff had received regular salary increases and a recent bonus, along with a letter from one of the employer's directors stating that the plaintiff's prospects for continued employment were good. This evidence was irrelevant, however, when offered to prove that the proffered reason for his firing (strained

---

**2.** Of course, there may be some cases where evidence of satisfactory performance is the *only* way to expose an employer's reason as a pretext, and in such cases the same proof may be used to make a prima facie case and show pretext. *See Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 19 (7th Cir.1987). Proof of generally adequate performance, however, may not be used to rebut a specific reason for discharge, and if the reason is deficient performance in one area, the plaintiff seeking to prove pretext must demonstrate adequate performance *in that area*. *See Aungst*, 937 F.2d at 1223.

relations with co-workers) was a pretext. 750 F.2d at 1414. We apply the same analysis here. Anderson may have earned a merit-based raise and a passable evaluation due to his ability to meet deadlines and produce written work, but this does nothing to show that Lacey was lying when he said he fired Anderson because of his inability to relate to his subordinates and dealers in an acceptable fashion and his unwillingness to accept his superior's suggestions for solving the problem. Without such evidence there is no issue as to pretext, and summary judgment may be granted.[3]

## CONCLUSION

At least arguably, Anderson has raised an issue as to his ability to make out a prima facie case. Summary judgment was still proper, however, as he has produced nothing to indicate that the reason given for his termination was a pretext for discrimination. Accordingly, the judgment of the district court is

AFFIRMED.

---

**3.** The plaintiff also contends that· *Shager v. Upjohn Co.,* 913 F.2d 398 (7th Cir.1990) is indistinguishable and that therefore, like the court in that case, we should reverse the grant of summary judgment. In fact, the case is distinguishable on elementary grounds. The plaintiff there produced *direct* evidence of age-based discrimination; he did not need to invoke the *McDonnell–Douglas* method of indirect proof. Indeed, the only similarities between that case and the case at bar are that they both involve summary judgment motions on ADEA claims.