Antoinette KOROTKO–
HATCH, Plaintiff,

v.

JOHN G. SHEDD AQUARIUM,
Defendant.

No. 97 C 4378.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 3, 1999.

Angela Imbierowicz, Chicago, IL, for plaintiff.

Cathy Ann Pilkington, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, this Court grants Defendant's Motion.

### FACTS

Plaintiff Antoinette Korotko–Hatch began working for Defendant John G. Shedd Aquarium ("the Aquarium") in 1983 at the age of 44. (Defendant's 12(M) Statement of Uncontested Facts [Def.'s 12(M)] ¶¶ 6, 15; Plaintiff's 12(N)(3)(b) Statement of Additional Facts [Pl.'s 12(N)(3)(b)] ¶ 155.) In 1985, she became Coordinator of Volunteer Services and received a salary increase every year thereafter until she was terminated. (Def.'s 12(M) ¶ 12; Pl.'s 12(N)(3)(b) ¶ 155.)[1] Her primary duties included recruiting new volunteers, speaking at community functions, preparing and distributing brochures and flyers, and supervising the volunteers. (Pl.'s 12(N)(3)(b) ¶¶ 157–58.) Her other duties involved: developing, planning, and conducting individualized orientations for volunteers; developing training materials for volunteer-run outreach programs; and managing volunteer-conducted special-group tours. (Pl.'s 12(N)(3)(b) ¶ 158.) Ms. Korotko–Hatch also developed a public outreach program at nursing homes and hospitals, and trained and assigned the volunteers. (Pl.'s 12(N) ¶ 160.)

The Volunteer Services Department and Ms. Korotko–Hatch were recognized and complimented for their outstanding work. (Pl.'s 12(N)(3)(b) ¶ 165.) The Department received three United Way "Heart of Gold" Awards, and in 1994 the Brookfield Zoo sent the Aquarium a letter praising Ms. Korotko–Hatch for her work. (Pl.'s 12(N)(3)(b) ¶ 165; Plaintiff's Memorandum in Opposition to Summary Judgment [Pl.'s Mem.Opp.] at Ex. AKH1.) Although Ms. Korotko–Hatch and the Aquarium differ as to the number, they agree that the number of volunteers at the Aquarium increased during her thirteen-year employment. (Pl.'s 12(N)(3)(b) ¶ 162; Def.'s 12(M) ¶ 162.)

Nanette Schonberg was Ms. Korotko–Hatch's supervisor and signed her performance evaluations for 1993 and 1994. (Def.'s 12(M) ¶¶ 68–69, 83; Deposition of Antoinette Korotko–Hatch [Pl.'s Dep.] at 575, May 28, 1998.) For the evaluation period covering 1993, Ms. Korotko–Hatch received an overall performance rating of "More Progress Needed."[2] (Def.'s 12(M) ¶ 70.) She received a rating of "Meets Expectations" in three of the seven areas under the category of Performance Characteristics, including Job Knowledge, Work Quality and Initiative. (Pl.'s 12(N)(3)(b) ¶ 201.) She received a rating of "Progress Needed" under Adherence to Policies, Relationships, Resource Utilization and Supervision categories. (Defendant's Memorandum of Law in Support of Summary Judgment [Def.'s Mem.Supp.] at Ex. NS4; Pl.'s 12(N)(3)(b) ¶ 202; Def.'s 12(M) ¶ 72; Defendant's Response to Plaintiff's 12(N)(3)(b) [Def.'s Resp.] ¶ 220.) Under Adherence to Policies, Ms. Schonberg stated that, although "Toni is a stickler for adherence to policies by the volunteers, and adheres to most policies and procedures," she has a "habit of bypassing her supervisor and going directly to the Director on matters . . . ." (Pl.'s 12(N)(3)(b) ¶ 204; Def.'s Mem.Supp. at Ex. NS4; Pl.'s Mem.Opp. at Ex. AKH7.) Although Ms.

---

1. These, and other, facts are stated in Defendant's Local Rule 12(M) or Plaintiff's Local Rule 12(N) Statements, or in the Exhibits attached thereto. As noted below, Plaintiff did not follow Local Rule 12(N)(3)(a)'s requirement that all contested facts be supported by the record. Therefore, all "disputed" facts from numbers 1–154 will be deemed admitted.

2. The Aquarium's performance evaluations contain five levels of performance rating: Unacceptable, More Progress Needed, Meets Expectations, Exceeds Expectations, and Outstanding. (Pl.'s 12(N) ¶ 198.)

Korotko–Hatch disagreed with her 1993 performance rating, (Pl.'s 12(N)(3)(b) ¶ 203; Pl.'s Mem.Opp. at Ex. AKH8.) she signed the evaluation but noted her own attached commentary. (Pl.'s 12(N)(3)(b) ¶ 200; Pl.'s Mem.Opp. at Ex. AKH7 –8.) Ms. Schonberg recommended in the 1993 evaluation that Ms. Korotko–Hatch delegate some of her duties to employee staff and utilize the facility's other resources. (Pl.'s Mem.Opp. at Ex. AKH7; Pl.'s 12(N)(3)(b) ¶ 207.) Other comments in the 1993 evaluation included that Ms. Korotko–Hatch "has a high sense of loyalty to the institution . . . . [and] has much to offer to the Aquarium." (Pl.'s Mem.Opp. at Ex. AKH7; Pl.'s 12(N)(3)(b) ¶ 211.) However, Ms. Schonberg emphasized in the evaluation that Ms. Korotko–Hatch "needs to focus her attention on management and administration and spend less time trying to do training and educational duties," and Ms. Korotko–Hatch stated in her deposition that this comment was one of the Aquarium's concerns. (Def.'s 12(M) ¶ 71; Pl.'s Dep. at 535, May 28, 1998; Pl.'s Mem. Opp. at Ex. AKH7.)

The Aquarium underwent a reorganization when Ted Beattie became the President and CEO in 1994. (Def.'s 12(M) ¶¶ 18, 28.) As part of the reorganization, Mr. Beattie initiated changes in the various departments, which involved expanding programs and promoting or hiring new managers. (Def.'s 12(M) ¶¶ 27–30.) Mr. Beattie treated Ms. Korotko–Hatch as a member of the management team and solicited her opinion regarding problems at the Aquarium. (Pl.'s 12(N)(3)(b) ¶ 178.) One of his goals was to remove some decision-making authority from individual managers and commit to a team approach. (Def.'s 12(M) ¶ 31.) He thought that less individual authority would require departments to interact more with one another and ultimately improve the Aquarium's success. (Def.'s 12(M) ¶¶ 32–33.)

One of Ms. Korotko–Hatch's duties, conducting special tours, was transferred to Lisa Pluta Woolford and Lindsey Foster, who were women in their "twenties." [3] (Affidavit of Antoinette Korotko–Hatch [Pl.'s Aff.] at ¶ 35; Deposition of Antoinette Korotko–Hatch ["Pl.'s Dep."] at 85–86, Mar. 20, 1998.) When Ms. Korotko–Hatch asked Ms. Foster and Ms. Pluta about the reassignment, Ms. Forster stated, "[i]t's a young group," and Ms. Pluta agreed. (Pl.'s Dep. at 86, Mar. 20, 1998.)

In early 1994, Ms. Schonberg rejected Ms. Korotko–Hatch's proposed format for the Aquarium's newsletter because she wanted "something more youthful." (Pl.'s Mem.Opp. at 20; Pl.'s Dep. at 57, Apr. 8, 1998.) She stated that "[w]e have got to start thinking youthful . . . and this newsletter is too academic. . . ." (Pl.'s Dep. at 58, Apr. 8, 1998.)

For the 1994 evaluation period, Ms. Korotko–Hatch again received an overall rating of "Progress Needed." (Def.'s Mem. Supp. at Ex. NS5.) The evaluation stated that Ms. Korotko–Hatch worked well with the volunteers and succeeded in selecting appropriate people. (Def.'s Mem.Supp. at Ex. NS5.) However, under the Overall Performance section, Ms. Schonberg stated that "[a]t this time, some of the short term goals have not been totally met." (Def.'s Mem. Supp. at Ex. NS6.) Other concerns that Ms. Schonberg stated in the evaluation were that Ms. Korotko–Hatch had not responded to her requests in a timely manner, resisted the internal changes, and needed to improve relationships with other managers. (Def.'s Mem. Supp. at Ex. NS5.)

Under the Relationships part of the 1994 evaluation, Ms. Schonberg stated that:

> [s]ome of the volunteers and staff are reluctant to work with Toni or talk to her because of the rigid, inflexible rules. Sometimes her expectations for the volunteers and the expectations for the de-

---

3. Although Ms. Korotko–Hatch had conducted special group tours prior to the reorganization, it was not one of her "essential duties." Rather, special group tours had been conducted by personnel from various departments. (Def.'s 12(M) ¶ 25.)

partment are not the same. Toni often blames others when there is a problem and becomes defensive, instead of looking for solutions and ways to alleviate the situation.

(Def.'s Mem.Supp. at Ex. NS5.) Ms. Schonberg further stated in the evaluation that Ms. Korotko–Hatch failed to complete many assigned tasks. (Def.'s 12(M) ¶¶ 101–02; Mem.Supp., Pl.'s Dep. at 601–602, May 28.) Ms. Korotko–Hatch's goals for the following year included becoming more flexible with changes, improving relationships, and completing tasks timely and appropriately. (Def.'s 12(M) ¶ 86; Def.'s Mem.Supp. at Ex. NS5.) Ms. Korotko–Hatch and Ms. Schonberg together agreed to these goals. (Def.'s 12(M) ¶ 93; Def.'s Mem.Supp., Pl.'s Dep. at 589, May 28, 1998.) In her deposition, Ms. Korotko–Hatch stated that, although she was aware of the comments she received in her evaluation, she, nonetheless, made no effort to improve her relationships. (Def.'s 12(M) ¶ 97; Def.'s Mem.Supp., Pl.'s Dep. at 592, May 28.)

In April of 1995, Ms. Schonberg revised Ms. Korotko–Hatch's evaluation to "Meets Expectations," because Ms. Korotko–Hatch "followed up with departments ... and ha[d] been working hard on directives from Ted." (Pl.'s 12(N)(3)(b) ¶ 221; Pl.'s Mem.Opp. at Ex. AKH11.) Ms. Korotko–Hatch then received a salary increase from $34,200 to $35,500. (Pl.'s 12(N)(3)(b) ¶ 222; Pl.'s Mem.Opp. at Ex. AKH11.)[4]

As part of the reorganization, Mr. Beattie decided to form a separate Public Interpretation Department.[5] (Def.'s 12(M) ¶ 124.) Ms. Korotko–Hatch disagreed with Mr. Beattie and told him that Public Interpretation should remain within the Education Department. (Def.'s 12(M) ¶ 124.) Mr. Beattie hired Lisa Woolford and Betsey Starinchak, women in their twenties, to run the new Public Interpretation Department. (Pl.'s Aff. ¶ 35; Def.'s 12(M) ¶ 127.) Ms. Korotko–Hatch again disagreed with Mr. Beattie's decisions and told him that she believed that Ms. Woolford was not qualified and lacked organizational skills, and that Ms. Starinchak was too immature for her position. (Def.'s 12(M) ¶¶ 128–130; Def.'s Mem.Supp., Pl.'s Dep. at 471, May 28.) However, Mr. Beattie assessed their educations and skills and concluded that they were well qualified to handle running the new program. (Def.'s 12(M) ¶ 127.) Mr. Beattie expected Ms. Korotko–Hatch to support Ms. Woolford and Ms. Starinchak's efforts to devise and implement their new program utilizing volunteers. (Def.'s 12(M) ¶ 131.)

On September 6, 1995, C.L. Kaiser, a manager in the new Public Interpretation Department, wrote a memo to Mr. Beattie describing three meetings that had occurred between herself, Ms. Korotko–Hatch, and the new Public Interpretation managers (Ms. Starinchak and Ms. Woolford). (Def.'s 12(M) ¶ 132; Def.'s Mem. Supp. at Ex. NS18.) Although the Public Interpretation Department managers wanted to proceed with their agenda regarding recruitment and training of volunteers, they were unable to do so because Ms. Korotko–Hatch's volunteer department deemed their agenda to be unworkable. (Def.'s 12(M) ¶ 132; Def.'s Mem. Supp. at Ex. NS18.) Upon receipt of this memo, Mr. Beattie sent a memo dated September 8, 1995 to Ms. Korotko–Hatch, Ms. Starinchak, and Ms. Kaiser, directing that Ms. Korotko–Hatch cease interference with Public Interpretation's new program and with the training and management of volunteers in that department.

**4.** "Aquarium policy provides that when an employee receives a 'progress needed' evaluation, within three months, the supervisor can revise the rating if an improvement is demonstrated." (Def.'s Mem.Supp. at 4 n. 6.)

**5.** "Public interpretation refers to the ability of Aquarium staff and its volunteers to affirmatively provide education and answer questions posed by members of the public about the Aquarium and its animals in an informal (non-classroom) setting." (Def.'s 12(M) ¶ 123.) Prior to Mr. Beattie taking over, the Public Interpretation function was administered through the Education Department. (Def.'s 12(M) ¶ 23.)

(Def.'s 12(M) ¶ 133; Def.'s Mem.Supp. at Ex. NS19.) Mr. Beattie concluded from this incident that Ms. Korotko–Hatch would not cooperate and that she wanted to "block and interfere with" Ms. Woolford's and Ms. Starinchak's new programs. (Def.'s 12(M) ¶ 134.) Ms. Korotko–Hatch stated in her affidavit that she recruited a large number of volunteers and placed them in Public Interpretation, but many of these volunteers were displeased, and the Department's volunteer staff eventually decreased by half. (Pl.'s 12(N)(3)(b) ¶¶ 196–97; Pl.'s Mem.Opp., Pl.'s Aff. at ¶ 26.)

The Aquarium also contained an Outreach Program, which was designed to educate the public about the Aquarium and, prior to Mr. Beattie's reorganization in 1994, was administered through the Volunteer Services Department. (Def.'s 12(M) ¶¶ 20–21.) After the reorganization, the Outreach Program moved from Volunteer Services to the Education Department. (Def.'s 12(M) ¶ 27; Def.'s Mem.Supp., Affidavit of Nanette Schonberg ["Schonberg Aff."] at ¶ 17.) Mr. Beattie promoted Bert Vescoloni to Director of the Education Department. (Def.'s 12(M) ¶ 109.) Ms. Korotko–Hatch again disagreed with Mr. Beattie's decision and told him that Mr. Vescoloni lacked organizational skills. (Def.'s 12(M) ¶ 110.) Mr. Beattie expected Ms. Korotko–Hatch to cooperate and respect his decision to move the Outreach Program to the Education Department under Mr. Vescoloni. (Def.'s 12(M) ¶ 111.) On numerous occasions during Ms. Korotko–Hatch's last year of employment, Mr. Vescoloni and his staff requested information from her regarding the Outreach Program; however, Ms. Korotko–Hatch refused to cooperate and instead criticized Mr. Vescoloni's ability to do his job. (Def.'s 12(M) ¶ 112.)

For example, on December 15, 1994, Mr. Vescoloni sent Ms. Korotko–Hatch a memo requesting information regarding the Outreach Program. (Def.'s 12(M) ¶ 113; Def.'s Mem.Supp. at Ex. NS7.) Ms. Korotko–Hatch did not even respond to his request until February 5, 1995, when she stated in a memo that she planned to have the information to him by May of 1995. (Def.'s 12(M) ¶ 114; Def.'s Mem.Supp. at Ex. NS8.) Following her memo, Bill Street, who worked under Mr. Vescoloni, sent a memo to Ms. Korotko–Hatch requesting that she provide specific information about the program, including program objectives, lists of volunteers, and budget figures for 1995. (Def.'s 12(M) ¶¶ 115–17; Def.'s Mem.Supp. at Ex. NS9.) After receiving no response, Mr. Street sent another memo to Ms. Korotko–Hatch requesting the same information by the following Friday. (Def.'s 12(M) ¶ 118, Def.'s Mem. Supp. at Ex. NS10.) On November 9, 1995, at Ms. Schonberg's request, Ms. Korotko–Hatch provided some numbers, but did not provide the information that he requested. (Def.'s 12(M) ¶ 119, Def.'s Mem.Supp. at Ex. NS11; Schonberg Aff. ¶ 32.) Almost one year from the initial request from Mr. Vescoloni, on November 16, 1995, Mr. Street sent Ms. Korotko–Hatch another memo thanking her for compiling the numbers, but again requesting that she provide the specific information that he initially requested. (Def.'s 12(M) ¶ 120; Def.'s Mem.Supp. at Ex. NS12.) About a month later, on December 12, 1995, Mr. Street sent Ms. Schonberg a memo indicating that he still had not received the information that he had requested back in February. (Def.'s 12(M) ¶ 121; Def.'s Mem. Supp. at Ex. NS13.) Mr. Beattie believed that Ms. Korotko–Hatch failed to cooperate for selfish reasons, and (Def.'s 12(M) ¶ 122), she was terminated two weeks later, on December 31, 1995. (Def.'s 12(M) ¶ 1.)

During Ms. Korotko–Hatch's last year of employment, Ms. Schonberg and Mr. Beattie attempted to remedy Ms. Korotko–Hatch's performance. (Def.'s 12(M) ¶¶ 140–41, 146; Def.'s Mem.Supp., Deposition of Ted Beattie ["Beattie Dep."] at 29.) Mr. Beattie met with Ms. Korotko–Hatch in individual meetings every five to six weeks. (Def.'s 12(M) ¶ 141; Beattie Dep. at 29.) In these meetings, Ms. Korotko–Hatch expressed to Mr. Beattie her diffi-

culty with the reorganization within the Education Department, "constantly blamed others" as the reason for uncompleted tasks, and "was very direct in questioning the ability of other managers to perform their jobs." (Beattie Dep. at 29–30; Def.'s 12(M) ¶¶ 143–45, 154.)

In Mr. Beattie's view, Ms. Schonberg had given Ms. Korotko–Hatch a number of tasks to complete over the course of a year and a half which Ms. Korotko–Hatch failed to accomplish. (Def.'s 12(M) ¶ 139; Def's Mem.Supp., Beattie Dep. at 27–28.) Furthermore, Mr. Beattie and Ms. Schonberg had received numerous complaints about her from other managers that indicated her inability or refusal to accept changes [6] in her job duties. (Def.'s 12(M) ¶¶ 139, 150–52; Beattie Dep. at 37–40.)

After Ms. Korotko–Hatch's termination on December 31, 1995, her duties were initially assumed by five Aquarium employees, including Ms. Schonberg, whose ages ranged from 25–52. (Def.'s 12(M) ¶ 13; Schonberg Aff. ¶ 6.) Eventually, Michelle Teague, age 26, was hired to replace her. (Id.)

### DISCUSSION

#### I. Standard for Summary Judgment

A motion for summary judgment should be granted only when there is no "genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). In reviewing a motion for summary judgment, the Court must view the record and draw all inferences in the light most favorable to the non-moving party. Martinez v. Labelmaster, Am. Labelmark Co., No. 96 C 4189, 1998 WL 786391, at *1 (N.D.Ill. Nov.6, 1998). However, the non-moving party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which re-

quires a jury trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." Id. at 587, 106 S.Ct. 1348 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

Local Rule 12(N)(3)(a) provides that the party opposing the motion for summary judgment shall file a concise response to each numbered paragraph in the moving party's 12(M) statement and, in the case of any disagreement, must support its responses with specific citations to the record. United States Dist.Ct.Rules, N.D.Ill., General Rule 12(N)(3)(a). If the non-moving party does not cite to the record for each disputed fact, such facts will be deemed admitted. United States Dist.Ct. Rules, N.D.Ill., General Rule 12(N)(3); Midwest Imports, Ltd. v. Coval, 71 F.3d 1311, 1313 (7th Cir.1995).

In her 12(N)(3)(a) response to the Aquarium's 12(M) Statement of Uncontested Facts, Ms. Korotko–Hatch did not appropriately dispute the Aquarium's factual averments. She did not dispute each paragraph and point to citations in the record. Therefore, all such denials are deemed admitted. The Seventh Circuit consistently enforces the District Court's Local Rules and "those who fail to strictly adhere to the mandates of Rule 12 must be prepared to face the harsh consequences of noncompliance because the Court will not comb the record in search of factual statements where no citation to the par-

---

**6.** The changes in Ms. Korotko–Hatch's duties as Coordinator of the Volunteer Services Department are deemed admitted to have resulted from the organizational changes under her new boss, Ted Beattie, including the team management structure that he instituted and growth in the institution. (Def.'s 12(M) ¶ 136.)

ties' Rule 12 statements has been provided." *Martinez*, 1998 WL 786391, at *1.[7]

On a motion for summary judgment, the Court only considers evidence that would be admissible at trial. *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 849 (7th Cir.1992). While a non-moving party's own affidavit or deposition can constitute affirmative evidence to defeat a motion for summary judgment, conclusory statements and allegations in affidavits are not sufficient to raise a genuine issue of material fact. *Mills v. First Federal Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 840 (7th Cir.1996).

## II. Standard for Analysis of Employment Discrimination Claim

The Age Discrimination in Employment Act of 1967 ("ADEA") prohibits employers from engaging in discrimination "because of [an] individual's age...." 29 U.S.C. § 623(a)(1). The ADEA legislation protects workers who are "at least 40 years of age." 29 U.S.C. § 631(a). "To succeed in an ADEA claim, a plaintiff must establish that [s]he would not have been terminated 'but for' [her] employer's intentional age-based discrimination." *Chiaramonte v. Fashion Bed Group Inc.*, 129 F.3d 391, 396 (7th Cir.1997).

■ A plaintiff may prove discrimination through either direct or circumstantial evidence, or the indirect burden shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which is now commonly utilized in discrimination claims under the ADEA. *See Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 424 (7th Cir. 1989). "Under either method, summary judgment is improper if the plaintiff offers evidence from which an inference of age discrimination may be drawn." *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402–03 (7th Cir.1996).

■ Direct evidence is "evidence which 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption,'" *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997) (quoting *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir.1989)), and requires the plaintiff to show that the employer acknowledges the discriminatory intent. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). The evidence must not only address directly the issue of discriminatory intent, "it must also relate directly to the specific employment decision in question." *Randle*, 876 F.2d at 569. Circumstantial evidence is evidence that "provide[s] a basis for drawing an inference of intentional discrimination." *Troupe*, 20 F.3d at 736. Here, Ms. Korotko–Hatch only attempts to prove discrimination through the indirect, burden shifting method. Therefore, the Court will proceed directly to the *McDonnell Douglas* framework.

## III. McDonnell–Douglas (Indirect)

■ Under *McDonnell Douglas*, the employee must establish a prima facie case of age discrimination by showing: (1) that she was in the protected class; (2) she performed her job well enough to meet her employer's legitimate expectations; (3) she was discharged in spite of her performance; and (4) the employer treated substantially younger, similarly-situated employees more favorably. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982–83 (7th Cir.1999). If the plaintiff can establish a prima facie case, a rebuttable presumption of discrimination arises and the defendant must present evidence of a legitimate, non-discriminatory reason for its actions. *See McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. Once the defendant meets this requirement, the prima facie case dissolves, and the burden shifts back to the plaintiff to show that the defendant's proffered reasons are really only a pretext for discrimination. *See Hoffman*

---

7. Although the Court will disregard unsupported "disputed" facts by Plaintiff, those for which she has provided supporting citations will be considered.

*v. MCA, Inc.*, 144 F.3d 1117, 1123 (7th Cir.1998). The ultimate burden of persuasion as to whether the defendant discriminated against the plaintiff remains with the plaintiff at all times. *Id.*

## A. Prima Facie Case

Ms. Korotko–Hatch has established elements one and three, in that she was over the age of forty and she was discharged. The Aquarium concedes that Ms. Korotko–Hatch has met the fourth element.[8] However, the fourth element, in and of itself, cannot raise an inference of discrimination. *Weihaupt,* 874 F.2d at 430. The discharged employee must also show the second element, that she was meeting the employer's legitimate expectations, such that an inference of discrimination can be drawn from the fact that she was replaced by someone substantially younger.

Ms. Korotko–Hatch and the Aquarium dispute whether she was meeting the Aquarium's legitimate expectations. Ms. Korotko–Hatch contends that she was meeting or exceeding the Aquarium's expectations. Where she has not met its expectations, she argues, such expectations were unreasonable.

Although the record contains scant evidence indicating that Ms. Korotko–Hatch was meeting the Aquarium's expectations for purposes of establishing the prima facie case, the Court will assume that Ms. Korotko–Hatch has met the requirements, and will proceed to the determinative issue, whether Defendant's actions in terminating the Plaintiff were discriminatory. *See E.E.O.C. v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 149–150 (7th Cir.1996) (noting that a "court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a prima facie case" and stating that "[t]o expedite the process it may be preferable to get past the prima facie case and examine the pertinent issue of whether there was discrimination in a job action.").

## B. Legitimate, Nondiscriminatory Reason

Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for terminating the plaintiff. *Mills,* 83 F.3d at 844. Such reason need not be correct, all that is required is that it be a nondiscriminatory explanation for why the challenged action was taken. *Id.* at 845. Although there are no specific requirements for what constitutes an employer's legitimate expectation; to be a legitimate expectation, it must be at least objectively reasonable, and adequately communicated to the employee. *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 463 (7th Cir.1986).

The facts in this case are substantially similar to those in *Anderson v. Stauffer Chemical Co.,* 965 F.2d 397 (7th Cir.1992). In *Anderson,* the plaintiff, refusing to admit that there was a problem or to take steps to correct it, failed to improve after complaints of poor performance and inability to get along with subordinates and customers. The plaintiff, nonetheless, had received regular wage increases throughout his employment. After receiving numerous complaints from customers and subordinates, the defendant decided to fire the plaintiff "for the good of the company." *Id.* at 401. The court found that such

---

8. The fourth element is met if the employer sought a substantially younger replacement for her or if the discharged employee's responsibilities are absorbed by other substantially younger employees. *Miller v. Borden, Inc.,* 168 F.3d 308, 313 (7th Cir.1999) (quoting *Oxman v. WLS–TV,* 846 F.2d 448, 455–56 (7th Cir.1988)) ("An employer who discharges a protected employee and either hires or *retains* younger employees 'to fill the positions for which the older employee was qualified' bears the burden of explaining its actions."). The younger employees need not be outside the protected class, but they must be at least ten years younger. *Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 892–893 (7th Cir.1997). The Aquarium initially assigned Ms. Korotko Hatch's work to at least two other younger employees and hired another person substantially younger as her permanent replacement.

complaints, along with the plaintiff's refusal to improve, represented legitimate, nondiscriminatory reasons for discharging him under the ADEA.

■ Similarly, the Aquarium discharged Ms. Korotko–Hatch because she failed, over a period time, to take the steps necessary to improve her work performance and relationships with other managers. Mr. Beattie and Ms. Schonberg had discussed the problem with Ms. Korotko–Hatch numerous times, but when Ms. Korotko–Hatch did not improve, they found it necessary to terminate Ms. Korotko–Hatch "for the good of the company." This is a legitimate, nondiscriminatory reason for terminating an employee. *See Anderson,* 965 F.2d at 401.

Ms. Korotko–Hatch cannot successfully argue that the Aquarium's expectations were unreasonable. An employer is entitled to expect of its employees timely completion of work, flexibility, and willingness to cooperate as a condition of their employment. Moreover, Ms. Korotko–Hatch received adequate notice of these expectations through her performance evaluations, various memos sent by Ms. Schonberg and Mr. Beattie, and individual meetings with Mr. Beattie.

The Aquarium has met its burden of rebutting the prima facie case. Once the defendant has articulated a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination disappears. *Mills,* 83 F.3d at 845. Thus, the ultimate burden remains with Ms. Korotko–Hatch to show that there is some genuine issue as to whether the Aquarium's stated reasons are really a pretext for age discrimination.

## C. Pretext

■ In employment discrimination cases, a pretext is a lie, or a "phony reason" for engaging in discriminatory conduct. *Id.* The pretext prong addresses the issue of whether the employer honestly believed its proffered reasons for terminating the plaintiff. *Anderson,* 965 F.2d at 402. A plaintiff can prove that an employer's proffered reasons for termination are pretextual by either " 'showing that a discriminatory reason more likely than not motivated the [employment decision], or ... that the employer's proffered explanation is unworthy of credence.' " *Mills,* 83 F.3d at 845 (quoting *Kralman v. Illinois Dep't of Veterans' Affairs,* 23 F.3d 150, 156 (7th Cir.1994)).

■ A plaintiff may show that the employer's explanation is unworthy of credence through evidence demonstrating "that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Testerman v. EDS Prods. Corp.,* 98 F.3d 297, 303 (7th Cir.1996). Here, Ms. Korotko–Hatch points to her performance evaluations as evidence that she was meeting the expectations of the Aquarium. Although her 1993 and 1994 evaluations specified her overall performance as "Progress Needed," she points to certain categories where she was given a "Meets Expectations" rating, and refers to specific positive comments about her performance. However, such appraisals are insufficient to create a material dispute about her performance. A general rating of "Progress Needed," in fact, demonstrates that an employee was not meeting the expectations of her superiors. *Jackson,* 176 F.3d at 985. Regardless of what she may have done adequately, her evaluations indicate that, overall, her superiors honestly believed that her performance was substandard.

■ Nonetheless, Ms. Korotko–Hatch argues that an overall rating of "Progress Needed" is not "tantamount to unacceptable .... although it may indicate a need for improvement." (Pl.'s Mem.Opp. at 14.) She is essentially asking the Court to determine that the Aquarium's evaluation of her means her performance was satisfactory because "Progress Needed" is not the same as "unacceptable." However, this Court does not review legitimate business decisions of employers. *See Dale,* 797

F.2d at 464 ("Th[e] Court does not sit as a super-personnel department that reexamines an entity's business decisions.").

In attempting to show pretext, Ms. Korotko–Hatch relies heavily on her own statements in affidavits, depositions, and her performance review self-appraisal.[9] However, these assertions, even if true, are insufficient to rebut the detailed evidence of the Aquarium's dissatisfaction with her performance. *See Gustovich*, 972 F.2d at 848 ("An employee's self-serving statements about his ability ... are insufficient to contradict an employer's negative assessment of that ability."). Ms. Korotko–Hatch " 'must do more than challenge the judgment of her superiors through her own self-interested assertions' because 'the employee's perception of herself is not relevant. [Rather, i]t is the perception of the decision maker which is relevant.' " *Mills*, 83 F.3d at 843 (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337–38 (7th Cir.1991)).

Ms. Korotko–Hatch's own assertions about her performance cannot establish a genuine issue of material fact. *See Jackson*, 176 F.3d at 971. To successfully raise a genuine issue of fact, Ms. Korotko–Hatch "must 'specifically refute the facts which allegedly support the employer's' proffered reasons." *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir.1995) (quoting *Sirvidas v. Commonwealth Edison* 60 F.3d 375, 378 (7th Cir.1995)); *see Fortier v. Ameritech Mobile Comms. Inc.*, 161 F.3d 1106, 1114 (7th Cir.1998) (holding that employee's "subjective self-appraisal ... cannot create a genuine issue of fact regarding the honesty of [the employer's] assessment of his performance.").

Ms. Korotko–Hatch also submits affidavits by volunteers who praised her for her work as Volunteer Coordinator. However, these flattering statements are insufficient to create a genuine issue of fact because these former volunteers were not involved in the decision to terminate Ms. Korotko–Hatch. *See Kephart v. Institute of Gas Tech.*, 630 F.2d 1217, 1223 (7th Cir.1980) (holding that affidavits of fellow employees stating that the plaintiff's performance was satisfactory are not enough to create a material issue of fact as to the quality of her work where employer felt that employee's work was unsatisfactory). The volunteers may have adored Ms. Korotko–Hatch, and Ms. Korotko–Hatch may have taken great pride in her work; but that does not mean that Ms. Korotko–Hatch was doing what her superiors expected her to do.

Ms. Korotko–Hatch argues that her performance evaluation revision to "Meets Expectations" and salary increase in April of 1995 demonstrate pretext. She contends that, if the Aquarium honestly believed that she was an unsatisfactory employee, she would not have received this increase. However, such evidence is insufficient to rebut the Aquarium's proffered explanation. The relevant time to consider whether she was meeting her employer's expectations is the time of discharge. *See Fortier*, 161 F.3d at 1113. Ms. Korotko–Hatch was terminated eight months after she received her salary increase. Therefore, she has not established that she was meeting the Aquarium's legitimate expectations at the time of her termination.

Similarly, in *Anderson v. Stauffer Chemical Co.*, the plaintiff attempted to submit as evidence of pretext positive performance evaluations and a pay raise. The plaintiff argued that such evidence was sufficient to show that the employer did not honestly believe its stated reasons for terminating him. However, the court rejected his contentions, because such evidence did not sufficiently rebut the employer's reasons for terminating him. *Anderson*, 965 F.2d at 403; *see Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1223 (7th Cir.1991) (plaintiff's merit increase and letter of recommendation shortly before discharge insufficient to establish pretext where such evidence does not re-

---

9. For example, in her 12(N)(3)(b) Statement, ¶ 163, Ms. Korotko–Hatch states that she

"was solely responsible for the successful growth of the volunteer program."

but employer's proffered reasons for terminating him), *overruled in part on other grounds, Oxman,* 12 F.3d at 657.

Likewise, Ms. Korotko–Hatch's merit increase in April does not refute the Aquarium's explanation for terminating her in December. The fact that the Aquarium thought that Ms. Korotko–Hatch's performance merited this increase in April of 1995 does not refute its explanation for terminating her the following December. The record indicates that the Aquarium based much of its decision on acts and omissions by Ms. Korotko–Hatch occurring after the revision and salary increase. She did not complete her work timely and appropriately, resisted implementation of various programs, and her superiors received complaints about her from other managers. Thus, the Aquarium was entitled to determine that Ms. Korotko–Hatch's deficiencies outweighed any improvements that she may have made months earlier.

Ms. Korotko–Hatch next submits a listing of terminated employees as evidence of intentional discrimination. (Pl.'s Mem. Opp. at 20, Ex. 11140.) The list contains names of employees, as well as their positions, dates of hire, reason for leaving, and last day of employment. On its face, this list shows nothing from which a jury could infer discrimination. Out of the sixty-eight listed employees, nineteen appear to be in the protected class. The reasons stated for their termination vary from deceased, resigned, retired, moved, and new job. None of these employees are listed as terminated involuntarily; however, one employee, Diana Dills, was listed as "position elimination" and terminated at the age of forty-two.

Ms. Korotko–Hatch attempts to show that this list is, in and of itself, probative of intentional discrimination. She does not show that she has personal knowledge of the performance of these workers or that the "real" reason for their termination was something other than what the Aquarium stated. She merely argues that this list is "evidence that persons in the protected class were terminated," coupled with the conclusory allegation that the Aquarium intentionally discriminated against older workers. Such speculation is insufficient to defeat summary judgment. *See Testerman,* 98 F.3d at 305 (holding that "mere fact that the five fired employees fell within the protected class, without more, does nothing to cast doubt upon [the employer's] articulated reasons for discharging [the plaintiff].").

Ms. Korotko–Hatch does, however, point specifically to four older employees to show that the Aquarium's proffered explanation was pretextual. She claims that Jack Marlowe "was forced out" of the Aquarium. (Pl.'s Mem.Opp., Pl.'s Dep. at 106–07, Mar. 20, 1998; Pl.'s 12(N)(3)(b) ¶ 264.) She points to Mr. Marlowe's deposition, where he stated that he had been interested in continuing to work after age seventy and one-half. (Def.'s Resp. to Pl.'s 12(N), Ex. 1, Deposition of Jack Marlowe ["Marlowe Dep."] at 38–39.) However, he also stated that he was not interested in continuing to work while taking monthly payments from his retirement plan. *Id.* Since he could not receive a lump sum and continue to work, he retired voluntarily at age seventy. *Id.* This evidence alone is not probative of discriminatory intent. *See Weihaupt,* 874 F.2d at 426 (noting that an early retirement program, standing alone, does not rise to the level of a discriminatory motive of the employer).

Ms. Korotko–Hatch also cannot show that the fate of the other three older employees demonstrates pretext. She gives no evidence to refute the Aquarium's assertions that: (1) Ellery Birge did not return to work after a 12–week FMLA leave; (2) John Dees was laterally transferred with no loss in pay or seniority; and (3) Ray Klain voluntarily left. (Def.'s Resp. to Pl.'s 12(N) ¶¶ 263, 265–66.) Ms. Korotko–Hatch has merely supplied her own conclusory allegations without any personal knowledge of discrimination. She does not rely on depositions or affidavits of these workers to create a genuine issue of

fact. Therefore, these conclusory allegations are insufficient to defeat summary judgment.

Ms. Korotko–Hatch next claims that various age-related remarks made by Ms. Schonberg and other employees are probative of age discrimination. Although a plaintiff can establish pretext by producing evidence that her performance was not inadequate, she may also satisfy this burden with evidence that the employer's "real concern" was her age. *Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir. 1990).

The Seventh Circuit has allowed plaintiffs to rely upon stray remarks by decision-makers as evidence of pretext. *See Futrell v. J.I. Case*, 38 F.3d 342, 346–47 (7th Cir.1994). However, even under the indirect method of proof, an employer's stray remarks cannot stand alone and be considered in the context of all of the evidence. *See Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir.1997). At the summary judgment stage, the Court must assume that the Aquarium's agents made the statements that are attributed to them. *Fuka*, 82 F.3d at 1403.

 Ms. Schonberg's statement that "[w]e have got to start thinking youthful . . . and this newsletter is too academic" is insufficient to show pretext. Even viewing this comment in the light most favorable to Ms. Korotko–Hatch, it does not show that Ms. Schonberg's reasons for firing Ms. Korotko–Hatch were a pretext for age discrimination. When Ms. Schonberg made this comment, she did not reject Ms. Korotko–Hatch's proposed format for the newsletter because of her age. An ordinary person would view her comment to mean that she was requesting that the newsletter be of a certain characteristic (youthful), and less of another characteristic (academic). The thesaurus in this Court's computerized word processing program provided "fresh," "energetic," and "enthusiastic" as some alternatives to "youthful," while "intellectual" and "scholastic" were provided for "academic". Corel, Word Perfect, Version 8.0; *see also*

*Hoffman*, 144 F.3d at 1122 (comments about "wanting fresh legs" too vague to demonstrate discrimination); *Shager*, 913 F.2d at 402 (holding that "words in praise of youth [do not necessarily] expose an employer to a trial under age discrimination."). The same reasoning applies to Ms. Schonberg's statement that she wanted "something more youthful" for the newsletter format. Furthermore, Ms. Korotko–Hatch admits that Ms. Schonberg made these statements more than ten months prior to the decision to fire her. These statements simply do not support the inference that the Aquarium's decision to terminate Ms. Korotko–Hatch was due to her age.

 Ms. Korotko–Hatch contends that the comments made by Ms. Foster and Ms. Pluta, new managers in the Public Interpretation Department, that "[i]t's a young group" are probative of the Aquarium's hidden agenda to discriminate. Again, age-related remarks may sometimes be probative of discrimination, however, the Court must look at the remarks in the surrounding circumstances to determine whether the employer harbored a discriminatory motive. *Shager*, 913 F.2d at 403. Isolated comments must be made by the decision-maker, unless the "plaintiff can show that the attitudes of the person who made the remarks tainted the decisionmaker's judgment . . . ." *Hoffman*, 144 F.3d at 1121–22. Ms. Korotko–Hatch has presented no evidence that Ms. Foster and Ms. Pluta tainted Mr. Beattie's and Ms. Schonberg's decision to terminate her. Thus, these remarks are not probative of an intent to discriminate.

It is also not age discrimination if an employer decides, in the course of its reorganization, to rearrange the duties and responsibilities of its employees. *Dale*, 797 F.2d at 465. Ms. Korotko–Hatch cannot argue that the change in her managerial duties is evidence of age discrimination merely because some of her duties had been transferred to younger employees in other departments. "The desire to estab-

lish a new management philosophy by assembling a new management team that displaces older employees does not ipso facto constitute ADEA discrimination." *Dale*, 797 F.2d at 465 n. 11 (noting the importance of considering that an employer instituting a new management philosophy may result in a higher turnover of long-term employees who may be "entrenched in established practices"). Nothing in the record indicates that Ms. Korotko–Hatch's duties were altered because of her age, and that is all that this Court must determine.

Ms. Korotko–Hatch's presentation falls short of convincing the Court that the Aquarium's explanations for her termination are unworthy of credence. In support of her contention that the Aquarium's motives were discriminatory, she relies heavily on her own self-interested assertions of her performance, conclusory allegations, and speculation. Such evidence is insufficient to show pretext and will not defeat a motion for summary judgment. *Weihaupt*, 874 F.2d at 428. The facts and arguments combined present a picture of an employee who took pride in her work, but did not approve of her employer's new management structure. Her disagreement with the new management structure inevitably resulted in the problems complained of by the Aquarium. The Court will not question the Aquarium's complaints about Ms. Korotko–Hatch any more than it will question its new managerial style. So long as age did not play a part in the decision to fire her, the Aquarium was entitled to exercise its independent business judgment.

### CONCLUSION

No matter how trivial an employer's reasons are for terminating an employee, the employee loses in an ADEA action if the employer honestly believes its non-discriminatory reasons for her discharge. The Aquarium has presented abundant evidence that Ms. Korotko–Hatch was terminated for non-discriminatory reasons—her poor performance and inability to get along with both superiors and subordinates. Ms. Korotko–Hatch has failed to demonstrate that the Aquarium's reasons were pretextual and, thus, has failed to meet her burden of establishing a genuine issue of material fact. Accordingly, Defendant is entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that: Defendant's Motion for Summary Judgment be, and the same hereby is, **GRANTED**. The Complaint is dismissed with prejudice.